# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| Christine Comas;  Michael Randy Gilmartin, by his guardian ad litem DeLinda Belanger; Jaymi Smith; Kim Smith, by her mother and guardian ad litem Betty Jo Ann Nelson; B. C., by her mother and next friend Joanna Campbell;  M. K., by her mother and next friend, Julie Kocher; Alex Cerame, by his mother and next friend Sheri Cerame; Sean Cheek; Ann Forbes and Gregory Forbes,  husband & wife; Crystal Bumphrey, by her mother and legal guardian Jennifer Bumphrey; Greg Mosley; Darren Politte;  and  Missouri Association of the Deaf, a non-profit corporation,  Plaintiffs,  v.  Keith Schaefer, in his official capacity as Director of the Missouri Department of Mental Health; Stephanie Winslow   in her official capacity as Director for Deaf Services, Missouri Department of Mental Health; Missouri Department of Mental Health; Ronald Levy, in his official capacity as Director of the Missouri Department of Social Services; Missouri Department of Social Services  Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No.  2-10-cv-04085-FJG |

## AMENDED COMPLAINT

## I.      Introductory Statement

1.      In this class action lawsuit, the 13 individual plaintiffs and representative parties,

who include adults and children, are citizens of Missouri who are deaf or hard of hearing ("deaf")

and who also suffer from mental illness.  The Missouri Association of the Deaf ("MoAD"), a non-

profit corporation, many of whose members are deaf, is also a plaintiff.  The representative parties,

the unnamed members of the defined plaintiff class, and MoAD are referred to collectively as the

"plaintiffs." The defendants are: the "DMH defendants," who include the Missouri Department of Mental Health ("DMH"), its Director, Keith Schaefer ("Schaefer") and its Director for Deaf Services, Stephanie Winslow ("Winslow"); and the "DSS defendants," who include the Missouri Department of Social Services ("DSS") and its Director, Ronald Levy ("Levy").

2.      Plaintiffs challenge, as violative of Title II of the Americans with Disabilities Act, 42 U.S.C.§§12131-12134 ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.§794 ("RA"), interrelated policies, practices, procedures, customs and usages (collectively, "policies and practices") of the defendants concerning the delivery of mental health services to deaf persons in Missouri. Deafness is a disability under the ADA and the RA. The challenged policies and practices are ones that, as applied and continuing to be applied to the plaintiff class members, have subjected them, are subjecting them, and unless relief is granted them in this case, will continue to subject them to substantial and continuing injury. Plaintiffs seek declaratory and injunctive relief against defendants.

## II.      Jurisdiction, Declaratory Relief, and Venue

3.      This court has jurisdiction over this action under 28 U.S.C. §1331.

4.      Declaratory relief is authorized by 28 U.S.C. §2201 and Fed. R. Civ. P. 57.

5.      Under 28 U.S.C. §1391, venue is proper in the Western District of Missouri in that defendants reside in the District and a substantial part of the events or omissions giving rise to the claims here occurred in the District.

6.      Under L.R. 3.2(b) (Western District of Missouri), divisional venue is proper in the Central Division of the Western District of Missouri in that defendants reside in the Division and the claims for relief arise in the Division.

2

### III. Parties

7.      Plaintiff Christine Comas ("Comas"), age 36, is a United States Citizen and a resident of Missouri. She is married. Comas is deaf, but is able to read and write, though not speak, English. However, she is fluent in American Sign Language ("ASL"), which is her primary language and her principal means of in person communication. Comas has completed all the requirements for an associates degree (a two year post secondary degree) at the National Technical Institute for the Deaf.

8.      Plaintiff Michael Randy Gilmartin ("Gilmartin"), age 25, is a United States Citizen and a resident of Missouri. He is unmarried and has no children. He is deaf and his English language reading and writing proficiency is very limited. He is much more proficient (even though only modestly proficient) in ASL; it follows that ASL is his primary language and his principal means of in person communication. Gilmartin proceeds by his guardian ad litem ("G. A. L."), DeLinda Belanger, pursuant to Fed. R. Civ. P. 17(c). Ms. Belanger is fully able to discharge the responsibilities of being Gilmatin's G. A. L., in that, among other things, she is fluent in ASL and college educated. Ms. Belanger has known Gilmartin for several years, and has consulted with him and secured his agreement for her to be his G.A.L. in this action.

9.      Plaintiff Jaymi Smith ("J. Smith"), age 40, is a United States Citizen and a resident of Missouri. She is unmarried and has no children. J. Smith is deaf and her ability to read and write English is limited. However, she is fluent in ASL, which is her primary language and her principal means of in person communication.

10.     Plaintiff Kim Smith ("K. Smith"), age 44, is a United States citizen and a resident of Missouri. She is single and has one son, age 18. She is deaf. K. Smith can read and write in English, though neither her reading nor writing in English is proficient. However, she is fluent in

3

ASL, which is her primary language and her principal means of in person communication. Smith proceeds here by her mother, Betty Jo Ann Nelson. Ms. Nelson is the G. A. L. for her daughter under Fed. R. Civ. P. 17 (c). She is the G. A. L. notwithstanding that Kim has a general guardian, Donna Hannah, who is the Webster County, Missouri public guardian because Ms. Hannah's representation of Kim in this proceeding would implicate a conflict between such representation and her role as Kim's general guardian. Ms. Hannah has been given written notice of this proceeding, and has no objection to Ms. Nelson acting as Kim Smith's guardian ad litem in it.

11.     Plaintiff B. C. ("B.C."), age 11, is a United States citizen and a resident of Missouri. She was adopted from China at the age of two by hearing parents who knew that she had been born deaf. B. C. is reasonably proficient in ASL for someone who is 11 years of age, and it is her primary language and her principal means of in person communication. B. C. proceeds here by her mother and next friend, Kay Campbell, pursuant to Fed. R. Civ. P. 17(c)(2).

12.     Plaintiff M. K. ("M. K."), age 11, is a United States citizen and a resident of Missouri. She is deaf and knows some ASL, though it is not proficient. Still, it is her primary language and her principal means of in person communication. M. K. proceeds by her mother and next friend, Julie Kocher, pursuant to Fed. R. Civ. P. 17(c)(2).

13.     Plaintiff Alex Cerame ("Cerame") age 18, is a United States Citizen and a resident of Missouri. He is deaf and a student at the Missouri School for the Deaf. His English language reading and writing ability is limited. However, he knows some ASL, though it is not proficient. ASL is his primary language and principal means of in person communication. Cerame proceeds here by his mother and next friend, Sheri Cerame, pursuant to Fed. R. Civ. P. 17(c)(2).

4

14. Plaintiff Sean Cheek ("Cheek") age 20, is a United States Citizen and a resident of Missouri. He can read and write English, though not proficiently. However, he is fluent in ASL, which is his primary language and principal means of in person communication.

15. (a) Plaintiff Ann Marie Forbes ("Ann. Forbes"), age 42, is a United States Citizen and a resident of Missouri. She is married to plaintiff Gregory Alan Forbes ("Greg Forbes") and they have two children.

(b) Plaintiff Greg Forbes, age 38, is a United States Citizen and a resident of Missouri. He is married to plaintiff Ann Forbes.

(c) Plaintiffs Ann Forbes and Greg Forbes are both deaf, but are nonetheless able to read and write English. At the same time, because they are deaf, they have limited ability (Ann Forbes) or no ability (Greg Forbes) to engage in spoken communication in English. They are both fluent in ASL, however, and that is their primary language and their principal means of in person communication.

16. Plaintiff Crystal Bumphrey, age 23, is a United States citizen and a resident of Missouri. She is unmarried and has no children. She is deaf. Her primary languages and principal means of in person communication are ASL and another form of sign language that is a variant of ASL. Bumphrey proceeds here by her mother and legal guardian Jennifer Bumphrey, pursuant to Fed. R. Civ. P. 17(c)(2).

17. Plaintiff Greg Mosley, age 27, is a United States citizen and a resident of Missouri. He is unmarried and has no children. He is deaf and has minimal English language skills, including limited ability to read and write English. His primary language and principal means of in person communication is ASL.

18.     Plaintiff Darren Politte, age 35, is a United States Citizen and a resident of Missouri. He is married but separated and has no children. He is deaf, but is able to read and write English and has some ability, though limited, to speak in English. He is fluent in ASL, however, and that is his primary language and principal means of in person communication.

19.     The 13 individual plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and (b)(2). The plaintiff class is defined as follows:

> All persons residing in Missouri on or after April 26, 2005 who: (a) have been, are, or will be deaf, that is, are persons who because of a hearing loss, are not able to discriminate speech when spoken in a normal conversational tone regardless of the use of amplification devices; (b) have relied, do rely, or will rely, as a result of being deaf, primarily on American Sign Language or another form of sign language for in person communications; (c) have suffered, are suffering, or will suffer from mental illness or who have children or spouses who suffer from such illness; (d) have sought or received, are seeking or receiving, or will seek or receive (or whose children have sought or receive, are seeking or receive, or will seek or receive) services, from or through the Missouri Department of Mental Health and/or the Missouri Department of Social Services (including from or through providers under the Medicaid Program, and administrative agents of DMH), that diagnose such illness or treat it.

20.     The plaintiff class is so numerous that joinder of all these persons is impracticable. According to DMH itself, the class numbers approximately 1,150 persons, about 80% of whom are adults and 20% children. Moreover, there are questions of law or fact common to the class, and the claims of the representative parties (*i.e.*, the 13 individual plaintiffs) are typical of the claims of the class. Further, the representative parties will fairly and adequately protect the interests of the class. Finally, the defendants have acted or refused to act on grounds generally applicable to the class, so that final injunctive and corresponding declaratory relief is appropriate respecting the class a whole.

21.     (a)     Plaintiff Missouri Association of the Deaf ("MoAD") is a §501(c)(3) non-profit corporation. Many of its individual members, who number more than 100 persons, are members of the plaintiff class.

6

(b)     Among the purposes of MoAd, as set forth in its Constitution, is to help secure the legal rights of its members under federal and state law.  MoAD is proceeding as a plaintiff in this lawsuit in order to advance this purpose, and to assist its individual members and the deaf community at large, whose advocate it is, to secure their rights under law.

22.     Defendant Missouri Department of Mental Health is a state administrative agency.

(a)     DMH includes four divisions: Alcohol and Drug Abuse; Comprehensive Psychiatric Services; Developmental Disabilities; and the Office of Comprehensive Child Mental Health.  Some plaintiff class members are eligible for mental health services from and/or receive such services from only one of these divisions; other plaintiff class members are eligible for mental health services and/or receive such services from or through more than one of these divisions.

(b)     DMH directly administers 11 inpatient hospitals that provide acute and long term psychiatric care to Missouri residents, including plaintiff class members.  It also contracts with and/or licenses other facilities, such as residential living centers and group homes, in which deaf persons in need of mental health treatment, including at least one of the individual plaintiffs, reside.  These hospitals and other facilities are referred to herein as "DMH hospitals and DMH facilities." ("DMH hospitals and DMH facilities" do not include "administrative agents," as described below).

(c)     DMH also provides outpatient psychiatric treatment to Missouri residents through "administrative agents," which are community mental health centers and clinics throughout the state.  There are 25 such administrative agents, one for each of the 25 service areas that DMH has established.  Several of the administrative agents have one or more "affiliate centers," meaning satellite mental health centers and clinics.

(d)     DMH administrative agents are so-called "purchase of service" agencies, private (usually not for profit) agencies that the state contracts with to deliver services the State itself

7

is responsible for providing to persons eligible for its psychiatric services. The administrative agents are DMH's principal "portals" for the delivery of outpatient psychiatric services. Specifically, the overwhelming majority of persons receiving mental health services from the DMH initially access (or seek access to) such services through the administrative agents, not through the inpatient facilities that DMH administers directly.

(e)    All DMH administrative agents are under the direct supervision and control of the DMH, and DMH remains legally responsible for the acts and omissions of all its administrative agents insofar as their compliance with the ADA and/or the RA is concerned, even if these agents have day to day operational responsibility for the delivery of mental health services to its clients.

(f)    All DMH administrative agents receive funding for services rendered through the Medicaid program, which is described in ¶25 below and some or all may also receive other forms of federal financial assistance, such as through the Medicare program.

(g)    DMH has in effect a means test (called the "Standard Means Test" or SMT) for purposes of providing mental health services. 9 C. S. R. 10-31.011. Individuals whose adjusted gross income is above the applicable DMH standard may be required to pay the Department for services they receive, but they are nonetheless eligible for such services. *Id*. at 10-31-011 (5)(7). If, however, an individual seeking services from DMH is eligible for Medicaid, Supplemental Security Income, General Relief or Food Stamps (collectively "public assistance eligible"), the "SMT is not required to be implemented." *Id.* at 31-011 (5)(I). The Missouri eligibility scheme for mental health services taken as a whole is one under which all citizens of Missouri (including plaintiff class members) are financially eligible, and otherwise eligible, for mental health services from DMH if they require such services, even if some of them might have to pay something for the

8

services. At the same time, on information and belief, most of the plaintiff class members who receive mental health services from DMH are public assistance eligible.

23.     Defendant Schaefer is the director of DMH and is ultimately responsible for: enforcing federal laws governing DMH that prohibit discrimination against the plaintiff class members based on their deafness, developing and implementing DMH policies and practices that affect the plaintiff class members and putting into effect or allowing to remain in effect challenged policies and practices to which the plaintiff class members are subject.

24.     Defendant Winslow is Director of the Office of Deaf Services of DMH and is immediately responsible for enforcing federal laws governing DMH that prohibit discrimination against the plaintiff class members based on their deafness, developing and implementing DMH policies and practices that affect the plaintiff class members, and putting into effect or allowing to remain in effect challenged policies and practices to which the plaintiff class members are subject.

25.     The Missouri Department of Social Services is also a state agency.

        (a)     DSS has many divisions. But at least two of the divisions are responsible for the delivery of health care services, including mental health services, to Missouri residents, including the plaintiff class members. These divisions are the MOHealthNet Division and the Family Support Division.

        (b)     The MOHealthNet Division and the Family Support Division administer numerous programs, but most of the programs are ones that are part of the Medicaid program, 42 U.S.C. §§1396 *et seq.* Medicaid is a federal-state medical assistance program: states administer the program pursuant to the requirements of federal law and receive a substantial amount of federal funding for doing so. Missouri, like all states, participates in Medicaid; the state calls its Medicaid program MOHealthNet.

9

(c)     Many and probably most of the plaintiff class members are eligible for MOHealthNet.

(d)     Under federal law, each state participating in the Medicaid program (all do) must designate a "single state agency" for administering the program in the state. In Missouri, DSS is the single state agency.  But DSS subcontracts some of its administrative responsibilities for Medicaid out to other state agencies, as it is permitted to do.   DMH is among the subcontracting state agencies for MOHealthNet, and, to the extent that Missouri provides or pays for mental health services to deaf persons eligible for Medicaid, it does so through DMH.

(e)     DSS is legally responsible for the acts and omissions of all state agencies that are its subcontractors for purposes of administering MOHealthNet, insofar as these acts and omissions involve violations of the ADA and/or the RA.   DSS is  also responsible for the acts and omissions of all medical providers accepting Medicaid funds for any of the clients whom they serve, insofar as these acts and omissions involve violations of the ADA and/or the RA.

26.     Defendant Levy is ultimately responsible for: enforcing federal laws governing DSS that prohibit discrimination against persons based on their deafness, developing and implementing DSS policies that affect the plaintiff class members, and  putting into effect or allowing to remain in effect challenged policies and practices  to which the plaintiff class members are subject, including,  in particular, policies and practices related to DSS's administration of MOHealthNet.

27.     The DMH policies and practices challenged in this complaint are attributable to defendants Schaefer and Winslow; and the DSS policies and practices challenged in this complaint are attributable to defendant Levy.  Defendants Schaefer, Winslow and Levy are sued in their official capacities only.

10

**IV. Statement of the Case**

**A. Deafness, American Sign Language, Mental Health Professionals, and Communication Between Mental Health Professionals and Deaf Clients**

28. Hearing loss, including deafness, is caused by a broad range of biological and environmental factors.

29. Hearing loss is categorized, in part, by its severity. The severity of hearing loss is, in turn, measured by the degree of loudness, as measured in decibels, a sound must attain before being detected by an individual. Hearing loss may be ranked as mild, moderate, severe or profound. Persons with a moderate hearing loss have a hearing loss of between 41-60dB inclusive, persons with a severe hearing loss have a hearing loss of between 61 and 90dB, inclusive, persons with a profound hearing loss have a hearing loss of 90dB or greater. Virtually everyone who has a severe or profound hearing loss are considered deaf by the medical community and considers himself or herself deaf. But, under a functional definition of deafness--under which persons who, while not severely or profoundly deaf, are still hard of hearing to an extent that they are unable, as a result of their hearing loss, to understand speech the speech of others--are also considered deaf by the medical community and themselves.

30. ASL is the identified language of the Deaf community in the United States and is used primarily in the United States and Canada. It is a visual-gestural-spatial method of communication in which placement, movement, and expression of the hands, face and body are elements of the language. ASL has its own grammatical structure and syntax distinct from English. It is not, as is often assumed, a signed version of the English language. It is complex in its customs and nuances, and it does not have a spoken or written equivalent.

11

31. Persons who have been deaf since birth or infancy--that is, before they acquire proficiency in a spoken language--may never develop meaningful spoken language skills. However, it is very likely that these same persons will develop ASL as their primary in person language modality. Moreover, many persons who become deaf after the acquisition of spoken language skills but relatively early in childhood also become fluent in ASL and associate themselves with deaf culture ("Deaf Culture"), which is the complex array of experience, beliefs, values, attitudes, behaviors and knowledge that deaf persons who primarily rely on ASL for in person communications share. Moreover, some persons who become deaf after the acquisition of spoken language skills associate themselves with Deaf Culture even though they do not learn ASL and retain the ability to vocalize. Some of these persons, sometimes referred to as the "oral deaf," may rely, for in person communication, on speech (lip) reading and, if proficient in writing and reading English (which many are), on an exchange of written notes. The efficacy of speech reading in effecting meaningful in person communication however varies widely with the proficiency of the speech reader. Good speech readers, in a good viewing situation, will understand a good deal of what another person says. Poor speech readers in a poor viewing situations will understand relatively little of what another person says and perhaps nothing at all.

32. Persons who become deaf after their acquisition of language skills retain their speaking ability (though they may have difficulty regulating the volume of their speech, and in articulating correctly), but, since they can, after the onset of their deafness, no longer hear what is being said to them, the utility of their speaking ability is severely compromised. As a result, many of these persons become fluent in ASL, associate themselves with Deaf Culture, and do not use spoken English, but instead ASL, as their primary language.

12

33.     As used herein, the term "mental health professionals" means psychiatrists, psychologists, licensed clinical social workers, licensed professional counselors and any other persons licensed under Missouri state law to provide mental health services. As also used herein, each person who is themselves reasonably fluent in ASL is referred to as, for example, a "signing mental health professional" or "signing case manager" as the case may be. In contrast, a mental health professional or other individual who does not sign is referred to as "non-signing." As also used herein, the term "certified interpreter" means an interpreter for the deaf and hard of hearing who holds a national certification as an interpreter from either the Registry Interpreters for the Deaf ("RID") or the National Association of the Deaf ("NAD"), or a Missouri state certification at level "4" or "5". As also used herein, a "qualified interpreter" means a certified interpreter who, because of his or her education, experience, and special training (*e.g.,* specialized training about mental illness among the deaf), or for other reasons, is able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary.

34.     The primary language for in person communication for virtually all the plaintiff class members is ASL, though some such persons may employ what is called Pidgin Sign English ("PSE"), which is a communication modality in which syntactic features of signed English are mixed with ASL vocabulary and ASL syntactic features. Using ASL, their ability to communicate with hearing persons depends on many factors, including whether the hearing persons themselves sign, the qualifications and experience of any ASL sign language interpreters ("interpreters"), and whether the plaintiff class members are themselves reasonably fluent in ASL.

(a)     Always, the most efficacious means of in person communication between a deaf person and another person are if both the deaf person and the other person, such as a mental health professional, are reasonably fluent in ASL and sign in each other's presence, because then

13

both parties are, by definition, communicating directly in a language in which they are fluent and through visual cues (including body language) that comes with being in each other's presence.

       (b)    When the hearing person does not sign, an interpreter can effect in person communication between a deaf person and a non-signing hearing person (*e.g.*, one of the individual plaintiffs and a non-signing mental health professional). As a means of effecting communication between a deaf client and a non-signing mental health professional, interpreters are sometimes problematic, however. Most significantly, the quality of interpreters varies widely. Thus, qualified interpreters are ordinarily able to translate reasonably accurately what is said between a non-signing mental health professional and a deaf client if the client is reasonably fluent in ASL. In contrast, certified interpreters who have not had suitable specialized training about mental illness among the deaf, and are not, for this reason or others, qualified interpreters will usually be unable to interpret in a manner permitting an accurate diagnosis of the client's mental illness, much less effective treatment for that illness. And interpreters who are not even certified will rarely, if ever, be able to interpret in a manner permitting an accurate diagnosis or effective treatment.

       (c)  Video Relay Interpreting ("VRI") services permit a deaf person to communicate over the internet and by phone with a hearing person using an ASL interpreter at a relay point. The ASL interpreter translates the hearing person's voice communication into ASL, signing what the hearing person says to the deaf person who is before a web cam; the deaf person signs back his or her response to the interpreter; the interpreter then translates the signed response into English for the hearing person who is on the phone. (VRI thus involves an interpreter acting as an intermediary between a deaf person and a hearing person in different locations). The intimacy of face to face communication is not possible using VRI. Indeed the parties to the conversation (excluding the interpreter) do not see each other at all. Also, many deaf persons cannot afford or for other reasons

14

(institutionalization) do not have ready access to VRI service equipment that one must have to use the service. For these reasons and others, VRI is rarely, if ever, employed to afford mental health therapy to deaf persons.

       (d)    In contrast to Video Relay Interpreting, Video Remote Interpreting involves an interpreter (on video) who is interpreting for a deaf person and a hearing person (*e.g.,* a mental health professional) who are in the same location.

       (e)    In budget documents submitted to the 2009 session of the Missouri legislature, DMH acknowledged that, when a deaf person communicates with a mental health professional through an interpreter rather than directly with a signing mental health professional, the quality of the therapy might be compromised because of the varying skill levels of the interpreters and because even qualified interpreters may not accurately interpret the needs and issues expressed by the deaf or hearing person as much as 20% percent of the time. In these same documents, DMH also stated "within the deaf community, there is a growing expression of need for psychiatric and psychological services to be provided directly by individuals who are fluent in American Sign Language (ASL) and have a full understanding of deaf culture." Against this background, DMH requested funding for "a team of medical and psychological professionals via Telehealth Technology Network ("TTN") who are fluent in ASL to respond to the emotional and social needs of the [deaf] population"--the suggestion being that such funding (the request was for $1,189,050) was necessary to help meet the need for such professionals, and that DMH was not meeting this need currently. It appears that the funding request was to establish a system (the TTN) in which a signing mental health professional could communicate directly with a distantly located deaf person without involving an interpreter at all. Whether or not DMH's TTN proposal would

have resulted in amelioration of any of the policies and practices challenged here, the Missouri Legislature did not approve DMH's funding request, even in part.

### B. Deafness and Mental Illness

35.    While the exact prevalence of psychiatric disorders among deaf persons (absolutely or in comparison to hearing persons) is uncertain, a greater proportion of the deaf population suffering from mental illness goes misdiagnosed, untreated, or maltreated by defendants than does the hearing population with mental illness (when also diagnosed or treated by defendants).

36.    People who are deaf experience physical and sexual abuse as children at high rates, and such trauma is itself associated with mental illness.   Also, most deaf children are born of hearing parents, very few of whom learn ASL, with the result that some deaf children are isolated within their families and do not develop close emotional relationships with their parents. Also, some deaf persons are, because of their deafness, isolated from the larger hearing community.

37.    Even a knowledgeable and experienced mental health professional who does sign or is able to access qualified interpreters to interpret for him or her, is unable accurately to diagnose or adequately treat deaf clients unless the mental health professional is also: (a)  knowledgeable about or, better yet, knowledgeable about and experienced with Deaf Culture, as described in ¶31 above ("knowledgeable about Deaf Culture"); and (b) knowledgeable  about, or better yet, knowledgeable about and experienced with, how the diagnosis of, symptoms of,  and effective modes of treatment of mental illness among deaf persons differ from those pertaining to hearing persons ("knowledgeable about deaf mental illness").  Plaintiffs refer to mental health professionals who are: (a)  reasonably fluent in ASL or who have ready access to qualified interpreters; *and* (b) who are knowledgeable about Deaf Culture; *and* (c) who are knowledgeable about deaf mental illness as "deaf treatment qualified mental health professionals."

16

### C. The Challenged Policies and Practices

38. Defendants, at all times relevant to this complaint, have had in effect or allowed to remain in effect interrelated policies and practices that exclude the plaintiff class members from participation in and deny to them the benefits of the services, programs, or activities of DMH and/or DSS, subject them to discrimination by these agencies because of their deafness, and otherwise violate their rights under Title II of the ADA and Section 504 of the RA.

(a) The DMH defendants have failed to provide, by recruitment, hiring, contracting, training and other means, for sufficient numbers of deaf treatment qualified mental health professionals to secure the rights of the plaintiff class members under Title II of the ADA and Section 504 of the RA.

(b) The DMH defendants have failed to provide, by recruitment, hiring, contracting, training and other means, for sufficient numbers of qualified interpreters to secure the rights of the plaintiff class members under Title II of the ADA and Section 504 of the RA.

(c) The DMH defendants have failed to provide, by recruitment, hiring, contracting, training and other means, for sufficient numbers of case managers, case workers, nurses and other professional staff who sign and/or who are knowledgeable about Deaf Culture and deaf mental illness, to secure the rights of the plaintiff class members under Title II of the ADA and Section 504 of the RA.

(d) The DMH defendants have failed to provide to the plaintiff class members mental health services that, given the extent (frequency and continuity) of such services, their breadth, and that these services are rarely provided by deaf treatment qualified mental health professionals, afford such class members an equal opportunity to obtain the same result and to gain the same benefit (in terms of accurate diagnoses of the mental illnesses from which class members

17

suffer and effective treatment of such illnesses) as that the DMH defendants afford to hearing persons.

(e)     The DMH defendants have allowed to remain in effect staffing practices (at DMH hospitals and DMH facilities and at administrative agents) that effectively require psychiatrists or other prescribing physicians sometimes to prescribe medications for the plaintiff class members without ever having directly communicated with them (or their guardians, if any), even through a qualified interpreter, with the result that informed consent for such prescribed medication is not secured. (Plaintiffs refer to these staffing practices, when they result in medications being prescribed without DMH having secured informed consent, as the "no informed consent staffing practices").

(f)     The DMH defendants have failed to place some plaintiff class members in integrated (*i.e.,* community based) treatment programs such as Independent Supportive Living Centers even when such programs are appropriate to meet their needs. Rather DMH confines these individuals in nursing homes and other residential facilities. Ordinarily, these facilities have no staff at all who sign and are knowledgeable about Deaf Culture, much less deaf treatment qualified mental health professionals. These facilities also ordinarily include very few deaf residents, and sometimes only one such resident. As a result, these individuals are isolated from other deaf persons or any other persons who can communicate with them. These individuals also often receive no mental health services at all except for medication, which may be prescribed by physicians who do not directly communicate with the deaf client at all, through qualifiedinterpreters or otherwise.

(g)     The DMH defendants have failed to oversee and administer operations at DMH hospitals and DMH facilities in a manner ensuring that, as required by federal law, these

18

hospitals and facilities provide mental health services to plaintiff class members in compliance with Title II of the ADA and Section 504 of the RA.

(h)     The DMH defendants have failed to oversee and administer operations at DMH administrative agents to oversee operations there in a manner ensuring that they provide mental health services to the plaintiff class members in compliance with Title II of the ADA and Section 504 of the RA.

(i)     The DSS defendants, by their oversight of and administration of MOHealthNet, including its contractual and licensing arrangements under this program, have permitted, promoted, and assisted each of the policies and practices described in ¶38(a)-(h) above, by, among other things, covering (paying for) mental health services (directly or through DMH and other subcontractors) to medical providers who receive federal financial assistance under Medicaid or and other federal programs, such as Medicare, but who do not do so in compliance with Title II of the ADA and Section 504 of the RA.

**D.     The Challenged Policies and Practices As Applied to the Individual Plaintiffs**

39.     As described in ¶¶40-51, the individual plaintiffs have been subjected to, are being subjected to, and unless appropriate relief is granted them in this case, will continue to be subject to, one or more of the policies and practices described in ¶38 above.

40.     Plaintiff Comas:

(a)     Following her plea to a crisis hotline for assistance–because she was profoundly depressed and was, she told the Hotline, about to take her own life, the St. Louis police, on or about September 22, 2009, transported Comas to the Metropolitan St. Louis Psychiatric Center ("Metropolitan").  Metropolitan is a DMH inpatient facility for mentally ill persons.

19

(b)     Comas, who resides in St. Louis, presented herself in the emergency room of Metropolitan, but, notwithstanding that she was manifestly in need of emergency care, Comas experienced delays of several hours before she could speak, through a sign language interpreter, with any physician or medical professional.  She finally was admitted as an inpatient at Metropolitan approximately seven hours after she first arrived for treatment on September 22.  On information and belief, the delay Comas experienced in being admitted was much longer than ordinarily experienced by persons similarly situated to Comas except that they were hearing, and who also had sought or were seeking emergency admission to Metropolitan.

(c)     Comas was admitted to Metropolitan, with diagnoses of Post Traumatic Stress Disorder ("PTSD") and Major Depression.  She was hospitalized there for ten days.  During her hospitalization:

(i)     She never once met with a deaf treatment qualified mental health professional.  Moreover, no one among the entire staff at Metropolitan with whom she came into contact signed.  It followed that, except on the occasions on which Metropolitan did provide an interpreter for her to participate in individual or group therapy, or other activities, Comas was unable meaningfully to communicate with professional staff at Metropolitan.

(ii)     Whereas every other inpatient in her unit at Metropolitan had the opportunity to meet with a mental health professional once each week day for individual (one on one) counseling, Metropolitan afforded Comas that opportunity, with a sign language interpreter, only four times in the two weeks she was there.  Metropolitan failed otherwise to provide a qualified interpreter for Comas  notwithstanding her repeated demands for one.

(iii)     Similarly, Metropolitan mental health professionals conducted group therapy sessions every week day for the patients there, and most patients participated in such

20

sessions each day. Comas wished to participate in these group sessions each week day as well, so advised staff of that fact and requested that an interpreter be provided to permit her participation. However, during her ten days confinement at Metropolitan, an interpreter was not regularly afforded Comas for these group therapy sessions, thus limiting Comas' participation in them.

(iv)    Each day during Comas's hospitalization, Metropolitan also conducted group sessions for inpatients focusing on such matters as coping with stress and managing depression. There were several such group sessions each day, and Comas, on most if not all days, requested that Metropolitan provide her with a qualified interpreter that would enable her to participate in these groups. But Metropolitan did not regularly provide such interpreters for the group sessions that Comas wished to participate in, so that Comas was unable to participate in many, if not most, such group sessions.

(d)    When Metropolitan discharged Comas, it recommended that she receive outpatient therapy and referred her to two mental health professionals, both of them associated with the Hopewell Clinic ("Hopewell"), but neither of whom were deaf treatment qualified mental health professionals. Hopewell participates in the Medicaid program, by accepting Medicaid funds for services it renders to Medicaid eligible persons, and, on information and belief, receives other federal financial assistance.

(e)    Comas promptly scheduled appointments with the Hopewell mental health professionals, emphasizing in her communications with the schedulers that she was completely deaf and so required sign language interpreters. When Comas arrived at the scheduled time for her first appointment, however, no interpreter was available. Comas nonetheless met with the Hopewell mental health professionals with whom she had a scheduled appointment, but the mental health professional and Comas were reduced to writing notes back and forth, which did not permit any

21

meaningful communication with or assistance to Comas. In the absence of an interpreter, the second Hopewell mental health professional refused to meet with Comas.

(f)     Following Comas's experiences with the two Hopewell mental health professionals, a Hopewell social worker contacted the Barnes Jewish Christian Hospital ("BJC") social work department on Comas's behalf, believing that BJC, which is affiliated with Washington University at St. Louis and is a DMH administrative agent, might have access to services for deaf mentally ill persons. The Hopewell social worker arranged for Comas to meet with a BJC social worker, explaining that Comas was deaf and would require a sign language interpreter.

(g)     Comas appeared for her meeting with the BJC social worker but BJC did not provide any interpreter, so the meeting took five minutes, and consisted mainly of handwritten notes. The social worker met with Comas a few days later, this time with an interpreter. The interpreter's sign language skills were very deficient, however, so that the communication between Comas and the social worker was severely impaired.

(h)     In her meeting with the BJC social worker, Comas expressed her wish to be referred to a signing mental health professional, because her experience with mental health professionals who did not sign, but proceeded through interpreters had, in general, been very disappointing. The social worker told Comas she was not aware of any signing mental health professionals in the entire St. Louis area and that it would be very difficult to secure the services of any mental health professional for Comas because she is deaf. Nonetheless the social worker said she would try to find a mental health professional who was willing to meet with Comas.

(i)     At no time after Comas and the BJC social worker met did the social worker, except as described in this subparagraph, refer Comas (who resides in St. Louis) to a single mental health professional in the entire St. Louis metro area, signing or non-signing, knowledgeable about

22

Deaf Culture or not, knowledgeable about deaf mental illness or not. The social worker did refer Comas to a BJC psychiatrist, who met with Comas in November 2009, solely to prescribe medication.

        (j)      Since her discharge from Metropolitan, the only counseling therapy that Comas has received has been with a signing mental health professional from Springfield, Missouri. For about three months, October through December 2009, this individual drove to St. Louis from Springfield and returned to Springfield (about a seven-hour drive round trip) every two or three weeks to meet with Comas in a restaurant for an hour. The mental health professional's time was not compensated by Comas or anyone else. The few sessions (there were only about five in all) were, however, far too limited in number to meet Comas's needs. In any event, Comas' sessions with the Springfield mental health professional ceased (not at Comas's request) as of January 2010.

        (k)      Through BJC, through private social service agencies, and other means, Comas, following her discharge from Metropolitan, has earnestly sought a deaf treatment qualified mental health professional in the St. Louis area to treat her. But her efforts have been entirely unsuccessful; she has not identified or had identified for her even one such mental health professional. However, she did recently (early in 2010) identify a family practice physician (and not a mental health professional at all) who agreed to meet with her, and whom she has seen on several occasions, through ASL interpreters who may or may not be certified and qualified, Comas does not know. Comas has not experienced any improvement in her mental health since she began seeing this family physician.

        (l)      Defendants have not afforded plaintiff Comas mental health services that secure her rights under Title II of the ADA and Section 504 of the RA.; they have violated her rights under those statutes.

41.    Plaintiff Gilmartin:

(a)    Gilmartin suffers from mental illness, including depression.

(b)    Gilmartin has a DMH caseworker from its Springfield Regional Office. This caseworker does not, however, know how to sign and DMH has not provided an interpreter for them (the caseworker and Gilmartin) to converse with each other.

(c)    DMH has confined Gilmartin at the Life Enhancement Village ("LEV") since approximately February 2008, LEV being a so-called "residential center" located in Nixa, Missouri, near Springfield, Missouri.

(d)    At no time during Gilmartin's confinement at LEV has any deaf treatment qualified mental health professional ever conversed with him about his mental health problems. The only treatment for his mental illness that Gilmartin has ever received at LEV has been massive doses of psychotropic medication, prescribed by physicians who, because of defendants no informed consent staffing practices, have little, if any, understanding of his condition, as these physicians have never communicated with him (even through an interpreter) and relied entirely on the reports of staff at LEV, none of who sign and so had never spoken directly with Gilmartin either. As a result, Gilmartin has never given his informed consent to the administration of the medications prescribed for him at LEV.

(e)    Gilmartin's activities at LEV have involved, almost exclusively, eating and sleeping. LEV had made little or no effort to involve him in even the LEV community, much less the deaf community or the larger community. For a period of a few months, DMH did approve four hours a week of Community Integration ("CI") activity for Gilmartin, which permitted him to get out into the community, but in December 2009, DMH, for reasons it never explained to Gilmartin, terminated CI activity for him.

24

(f)    While Gilmartin does not have the skills to live completely independently, he does have the intelligence and the skills to live in a much more independent environment than LEV offers him.  LEV, in other words, is not remotely the least restrictive placement for him.  Nor is LEV a community that brings Gilmartin into contact with other deaf persons, permitting him to form relationships with other deaf persons.

(g)    The events of September 16-September 21, 2009 involving Gilmartin are illustrative of some of the policies and practices described in ¶38 above.  Gilmartin, despondent over, among other things, being confined in an environment (*i.e.*, LEV) that did not bring him into any contact with other deaf persons and did not afford him any meaningful treatment for his mental illness, ran away from LEV.  Gilmartin's case manager at the Springfield Regional Office was notified that Gilmartin had run away from LEV, and facilitated his return, but did nothing to help afford him the mental health treatment he required or secure for him an alternative placement to LEV.  Gilmartin, still despondent and for the same reasons, ran away from LEV again the next day, however.  LEV staff located him reasonably promptly, and returned him to the facility, whereupon Gilmartin became violent and threatened to hurt himself or others with broken glass.  The Director of LEV thereupon called the police, who took Giilmartin to Cox North Hospital ("Cox North") in Springfield, Missouri.  Cox North which receives federal financial assistance under the Medicaid program  and other federal programs, such as Medicare,  initially refused to admit Gilmartin, notified LEV of that fact, and said it was going to release him into LEV's care.  However, LEV stated that it would not take Gilmartin "back" unless Cox first treated him, at least by way of medication. Under these circumstances, Cox North decided to admit Gilmartin into the Cox North Psychiatric Ward, where he remained for almost four days. During the period, Cox North only occasionally provided an interpreter to facilitate communication between Gilmartin and Cox North

mental health professionals, none of whom, however, were deaf treatment qualified mental health professionals. Accordingly, Gilmartin received very little counseling therapy while he was an inpatient at Cox North, and then not from deaf treatment qualified mental health professionals. Cox North psychiatrists did prescribe psychotropic medication for Gilmartin, but without securing his informed consent to do so. Gilmartin returned to LEV, heavily medicated, and he has since remained there.

      (j)     Defendants have not afforded plaintiff Gilmartin mental health services that secure his rights under Title II of the ADA and Section 504 of the RA.; they have violated his rights under those statutes.

    42.     Plaintiff J. Smith :

      (a)     J. Smith suffers from bipolar disorder, post traumatic stress disorder, anxiety, and depression.

      (b)     In connection with the mental illnesses she suffers from, J. Smith, since February 2007, has been hospitalized at least six times at Cox Hospital ("Cox") in Springfield, Missouri Her most recent hospitalization was from about June 17 to June 25, 2009. At all relevant times, Cox has been a recipient of federal funding under the Medicaid program, and other federal programs, such as Medicare.

      (c)     The duration of J. Smith's confinements at Cox have ranged from about one week to about six weeks, and have totaled an estimated 200 days.

      (d)     At no time during J. Smith's confinements at Cox has a qualified deaf treatment mental health professional ever spoken with her. During her confinements, J. Smith has been assigned to two or three different mental health professionals, who have spoken with her through an interpreter. Approximately six different interpreters have been used, but the interpretive

skills of some of them strongly indicated to J. Smith that they were not qualified interpreters. Moreover, the interpreters were not assigned to J. Smith's case on any regular basis, or frequently. For example, during her most recent hospitalization, for eight days in June 2009, J. Smith was afforded no more than about five hours of counseling therapy, all through an interpreter, but sometimes not a qualified one, and never with a deaf treatment qualified mental health professional. In a three-day period during that hospitalization, Cox provided J. Smith no interpreter for any purpose, despite that Cox isolated her in a room by herself because she had cut herself in frustration. In all, of the estimated 200 days that J. Smith was confined at Cox, she has had (she estimates) no more than about 50 hours of one on one treatment with any mental health professional, and, on information and belief, she has never been treated by a deaf treatment qualified mental health professional.

(e)     Cox, during J. Smith's hospitalizations there, also has required or suggested that she attend classes and "group therapy" with hearing patients. But Cox only occasionally assigned interpreters to these classes or groups, so that most of the time J. Smith was not able meaningfully to participate in them.

(f)     The principal treatment Cox has provided to J. Smith during her several confinements there has been psychotropic and other medications, which, because of defendants' no informed consent staffing practices, was prescribed by physicians who did not always speak with J. Smith, even through an interpreter, before prescribing such medication. Morever, neither these prescribing physicians nor any other staff at Cox ordinarily explained anything about these medications to her, through interpreters or otherwise. As a result, DMH ordinarily did not secure J. Smith's informed consent to the administration of the medications prescribed for her.

27

(g)     Defendants have not afforded plaintiff J. Smith mental health services that secure her rights under Title II of the ADA and Section 504 of the RA.; they have violated her rights under those statutes.

43.     Plaintiff K. Smith:

(a)     In June 2008, K. Smith was confined as an inpatient to the Southwest Missouri Rehabilitation Center in El Dorado Springs ("Southwest Hospital"), which is a state psychiatric hospital that DMH administers. She was admitted to the hospital with a diagnosis of severe depression.

(b)     During her confinement at Southwest Hospital, K. Smith has been the only deaf inpatient.

(c)     Southwest Hospital does not employ or contract with any deaf treatment qualified mental health professionals and no such individual has ever treated K. Smith at Southwest Hospital.

(d)     No Southwest Hospital mental health professional or professional staff member is a proficient signer. Accordingly, no such mental health professional or professional staff member is able meaningfully to communicate directly with K. Smith for any purpose. Instead, they are obliged to communicate with K. Smith through such outside interpreters as DMH provides.

(e)     DMH has contracted with an interpreter to interpret for K. Smith for two hours a day, twice a week. Sometimes, however, K. Smith's interpreter has not met her scheduled appointments with K. Smith, and, in these cases, DMH has rarely if ever provided a substitute interpreter.

(f)      Because DMH does not provide an interpreter to K. Smith for any "group" therapy" or other group activities to which spoken communication is integral, K. Smith has been effectively excluded from such group therapy and activities.

(g)      During her confinement at Southwest Hospital, the principal form of treatment DMH has provided to K. Smith has been to prescribe for her massive amounts of psycotropic and other drugs.  Indeed, K. Smith is heavily medicated most of the time. Staff at Southwest Hospital has never explained to K. Smith or her guardian, however, anything about the drugs she is required to take, so that defendants have never secured for K. Smith informed consent for the administration to her of the drugs prescribed.

(h)      Under all the circumstances, including K. Smith's mental illness, Southwest Hospital  is not the least restrictive placement for her, as attested to, in part, by the fact that, prior to her commitment, she worked at several jobs for substantial periods of time and enjoyed substantial periods of independence.

(i)      As a result of defendants' treatment of K. Smith at Southwest Hospital, her medical condition has deteriorated markedly during her 18-month confinement there. Most prominently, she has become more depressed, and, whereas she entered Southwest Hospital with the intent of being released from confinement there as soon as practical, she now often seems resigned to staying confined there for an extended period, even for the rest of her life. She also shows decreasing interest in the world around her and in maintaining an ongoing relationship with her mother and son. She also has gained more than 50 pounds during her confinement, evidencing that defendants have paid as little attention to maintaining her physical health as they have her mental health.

29

(j)     Defendants have not afforded plaintiff K. Smith mental health services that secure her rights under Title II of the ADA and Section 504 of the RA; they have violated her rights under those statutes.

44.     Plaintiff B..C.:

(a)     Plaintiff B. C.'s parents, were divorced in 2004, when B.C. was six. The divorce was traumatic for B.C. and the resulting separation from her father, to whom she was greatly attached, was difficult for her,  especially when, about a year after the divorce decree was entered, her father stopped visiting her for almost three years.

(b)     Beginning early in 2008, B.C.'s father resumed his visits with her, but only episodically (and not at all from July 2008 to the spring of 2009).

(c)     B.C., who is of average or above average intelligence, has suffered from continuing depression, and mental distress and anguish for several years.  Whatever the reasons for her depression and distress and anguish (*e.g.,* her having been adopted, the divorce of her parents, her relationship with her father, her deafness, indirectly), her deafness is a complicating factor in the treatment of her mental illness, and makes treatment more difficult.

(d)     In an effort to secure help for her daughter's mental distress and anguish, Kay Campbell, on September 24, 2009, sought out mental health services from the Ozark Center ("Ozark") in Joplin, Missouri.  Ozark, which provides such services, is a DMH administrative agent, and has an assigned catchment area that includes the City of Joplin, which is where B.C. and her mother live.

(e)     Ozark told Kay Campbell that it would provide mental health services to B. C., but, as it did not have any signing mental health professional on staff, it would have to locate a qualified interpreter before therapy could begin. To date, however, Ozark has not advised Kay

30

Campbell that it has identified a qualified interpreter for her daughter, despite inquiries from Kay Campbell.

(f)     In September 2009, Kay Campbell, to secure mental health services for B. C., also inquired of the College Skyline Center ("Skyline Center") whether it could do so. The Skyline Center, which is located in Joplin, is a privately owned health care and social services provider that offers psychological counseling to children and adults, among other services. College Skyline is not a DMH administrative agent, but, on information and belief, receives federal financial assistance under the Medicaid program and other federal programs, such as Medicare. When Kay Campbell inquired of College Skyline about mental health services for B. C., a College Skyline representative told her that the Center had no signing mental health professionals on its staff, and that it would not provide a sign language interpreter for B. C. to enable her to begin therapy with a hearing (but non-signing) mental health professional.

(g)     Defendants have not afforded plaintiff B. C. mental health services that secure her daughter's rights under Title II of the ADA and Section 504 of the RA; they have violated her rights under those statutes.

45.     Plaintiff M.K.:

(a)     M. K. has attended the Branson Public Schools ("Branson Schools") since starting school, but has always lagged academically behind her peers. Until this academic year (2009-2010), the Branson Schools have always placed M. K. in special education classes for all academic subjects; this academic year, she is being "mainstreamed" for Science and Social Studies, though she still lags behind her peers in those classes.

(b)     M. K. has suffered from continuing and substantial mental distress and anguish for many years.

31

(c)	On the recommendation of a deaf education counselor in the Branson Schools in the fall of 2008, Mrs. Kocher took M. K. for an evaluation at Burrell Behavioral Health ("Burrell") in Springfield, Missouri, which is a provider of outpatient mental health services and a DMH administrative agent Burrell receives federal financial assistance under the Medicaid program and other federal programs, such as Medicare. M. K. lives in Branson, which is in Burrell's catchment area. The purpose of the Branson School's referral to Burrell was for M. K. to be evaluated for an autism spectrum disorder and to receive such services, including mental health services, as would be appropriate in light of any autism spectrum disorder from which she suffered and her deafness. Burrell had recently established a specialized autism center that offered, among other things, evaluations of children who might be autistic.

(d)	Burrell conducted or purported to conduct an initial evaluation of M. K. in October 2008. The evaluation consisted principally of an evaluator (whether she was a mental health professional Mrs. Kocher does not know, but on information and belief, if she was a mental health professional, she was not a deaf treatment qualified mental health professional) watching M. K. play with toys and dolls for a period of about 30-45 minutes. A sign language interpreter, provided by Burrell, was present at the evaluation, but hardly participated at all.

(e)	Mrs. Kocher paid Burrell for the evaluation through her employer provided private insurance. However, as required by her insurance plan, she also paid Burrell a $30 co-payment.

(f)	While Burrell, after the October 2008 appointment, set a follow-up appointment in November for M. K., the week after the evaluation a Burrell representative advised Mrs. Kocher that Burrell was unable to assist M. K. in any way, even to fully evaluate her. The

32

representative did not offer any reasons for that determination, and did not even offer what determinations, if any, Burrell had made as a result of the evaluation it conducted.

(g)     Defendants have not afforded plaintiff M. K. mental health services that secure her rights under Title II of the ADA and Section 504 of the RA; they have violated her rights under those statutes.

46.     Plaintiff Cerame:

(a)     Alex Cerame ("Alex") has been diagnosed with ADHD, Bipolar Disorder, and Post- Traumatic Stress Disorder ("PTSD").

(b)     Until several years ago, Alex was treated for his mental illness by a private psychologist in the St. Louis area who was a deaf qualified mental health professional. That psychologist provided individual therapy to Alex and family therapy to Alex and members of his immediate family. But this psychologist moved away from Missouri, and Alex's individual and family therapy services were discontinued at that time. Thereafter, Alex was treated for his mental illness only by a private psychiatrist in the St. Louis area who mainly prescribed medication for Alex.

(c)     After the psychologist who was providing therapy for Alex left Missouri, Alex's parents sought to identify another deaf treatment qualified mental health professional in the St. Louis area to provide therapy for Alex and his immediate family, but were unable to identify one.

(d)     In April and again in May 2009, at the Missouri School for the Deaf, in Fulton, Missouri, where Alex is a residential student, he was twice sexually assaulted by another student and then threatened with death by that same student. Due to the emotional trauma of those events, including his fears about remaining at the school, Alex's parents brought him home to St. Louis for the late spring and summer.

33

(e)     During the spring and summer of 2009, Alex's mother, Sheri Cerame ("Sheri"), searched for a mental health professional in the St. Louis metropolitan area who was qualified to provide therapy for Alex.  Sheri's search for a qualified therapist included contacting numerous social service agencies, including BJC Behavioral Health, an administrative agent of DMH, and the St. Louis County Regional Office (formerly known as Regional Center), a component of DMH, and speaking with others with knowledge of services for deaf people in the community.  Her search, however, was completely unsuccessful as she did not identify even a single deaf treatment qualified mental health professional in the entire St. Louis metropolitan area who could provide therapy for Alex.

(f)     Because she was unable to find a qualified mental health professional to treat Alex in the St. Louis area, Sheri expanded the geographic scope of her search, and identified a signing mental health professional in Columbia, Missouri.  Alex has been seeing that therapist at Missouri School for the Deaf (which is about thirty minutes from Columbia) for several months.  But Alex and his family need individual and family therapy by a deaf treatment qualified mental health professional in the St. Louis metropolitan area, so that Alex and other members of his family can maintain a continuing relationship with the therapist throughout the year, including school vacations, and so that such therapist would be available to him and the family after he graduates from Missouri School for the Deaf, which will be in just about a year.  But no such services are or, absent relief in this case, will be available in the St. Louis metropolitan area.

(g)     Defendants have not afforded plaintiff Cerame mental health services that secure his rights under Title II of the ADA and Section 504 of the RA; they have violated his rights under those statutes.

47.  Plaintiff Cheek:

(a)  Cheek was abused and neglected as a child and ultimately became a ward of the State of Missouri (foster children).

(b)  Because of the abuse and neglect to which he was subject as a child, and for reasons related to his deafness, Cheek has suffered from serious emotional problems his entire life, and is mentally ill.

(c)  Cheek left his adoptive mother's (Linda Cheek's) home in March 2009, when he was 19 years old. Shortly thereafter, at his mother's urging, he sought out mental health services from Burrell.

(d)  Burrell agreed that Cheek required mental health treatment, and agreed to treat him.

(e)  The mental health treatment Burrell has afforded Cheek is illustrative of some of the policies and practices described in ¶38 above. Burrell assigned Cheek to a mental health professional who was not a deaf treatment qualified mental health professional. While Burrell did arrange for interpreters to be present at therapy sessions, they were not qualified interpreters.

(f)  Defendants have not afforded plaintiff Cheek mental health that secure his rights under Title II of the ADA and Section 504 of the RA; they have violated his rights under those statutes.

48.  Plaintiffs Ann Marie Forbes and Gregory Forbes

(a)  Ann Forbes and Greg. Forbes have, at all relevant times, suffered from serious emotional problems and mental illness. Ann Forbes has been diagnosed with adjustment disorder, anxiety, and depression. Greg Forbes has been diagnosed with bipolar disorder, explosive

35

disorder, severe depression, post-traumatic stress disorder, obsessive compulsive disorder, and an addiction disorder..

(b)     In the late spring or early summer of 2008, Ann Forbes and Greg Forbes, who had, for a period of about three months earlier in the year, received mental health services in joint (couples') therapy from the only signing mental health professional at Burrell, were told by the mental health professional whom they had been seeing that this individual was leaving  Burrell's employ.

(c)     The Forbes thereupon requested that they be assigned to another signing mental health professional, in order that they might continue with their joint therapy. In response to this request, however, Burrell advised them that it did not provide joint or family therapy to any deaf persons (*i.e.*,  therapy to the deaf person together with therapy to other deaf or hearing members of his family), though apparently there was no such prohibition at Burrell as the provision of joint or family therapy for hearing persons.  Burrell also advised the Forbes that it did not have on staff nor could it refer either of them to a signing mental health professional, though it would assign each of them to a non-signing mental health professional (and an interpreter) for individual treatment.

(d)     Beginning early in  the fall of 2008, the Forbes saw (separately)  non-signing mental health professionals to whom Burrell referred them.  But the non-signing mental health professionals to whom they were assigned had no knowledge about Deaf Culture or about deaf mental health, *i.e.*, they were not qualified deaf treatment mental health professionals. Moreover, while Burrell did arrange for interpreters to be present at some of the scheduled therapy sessions, some of the interpreters provided were not qualified.  In these respects, the Forbes were subject to some of the policies and practices described in ¶38 above.  In any event, the therapy afforded the Forbes had little or no efficacy–both Ann  Forbes and Greg Forbes were of the view

that it was useless–and both Ann Forbes and Greg Forbes terminated their therapy in approximately December 2008.

(e)     Ann Forbes resumed her individual therapy at Burrell in early April 2010 because of her anxiety and depression arising, in part, out of her husband's abusive behavior towards her. The non-signing mental health professional to whom Ann Forbes was assigned, however, knew nothing about Deaf Culture, meaning, in part, that she (the mental health professional) spent part of each session asking Ann Forbes about how deaf people "behaved" or "expressed their emotions." Moreover, the skills of the interpreter whom the mental health professional employed were grossly deficient; Ann Forbes estimates that she (the interpreter), who frequently asked Ann Forbes, to "re-sign," understood less than half of what Ann Forbes was signing.

(f)     Notwithstanding Ann Forbes' view that her current therapy Burrell is not helping at all, she is continuing with it in the faint hope that the therapy might improve, and because she has absolutely no alternatives in terms of securing mental health treatment.

(g)     Defendants have not afforded plaintiffs Ann Forbes and Greg Forbes mental health services that secure their rights under Title II of the ADA and Section 504 of the RA; they have violated their rights under those statutes.

49.     Plaintiff Bumphrey:

(a)     Bumphrey is mentally ill. She is depressed and anxious, has difficulty controlling her behavior, and is often a physical threat to her Mother, with whom she lives, and others. Her medical diagnoses include Mood Disorder NOS, Anxiety Disorder NOS, and Mental Retardation, Mild. She has severe problems with low self esteem, socialization, independent living, and employability.

37

(b)     Bumphrey is a client of DMH, Division of Developmental Disabilities.  She receives services through the St. Joseph Branch Office of the Albany Regional Office and its affiliated agency, Progressive Community Services.  Due to her mental disabilities, she needs training in many areas, including life skills, independent living skills, and employment skills.  To obtain such training she was approved for day services at Community  Recreation and Resocialization Center ("CRRC"), but she has been on a waiting list for services for more than a year.  On information and belief, CRRC is affiliated with and receives funding from the Albany Regional Center and the Family Guidance Center, an administrative agent of DMH.  Even if she were accepted into that program, it would be of limited benefit to Bumphrey because of her deafness.  CRRC has only one part-time staff member who signs.

(c)     Bumphrey also needs to live in a group home, or other supported living facility, due to her mental and emotional disabilities and her sometimes violent tendencies.  Her mother has requested such services from the DMH Regional Office and its affiliated agency, Progressive Community Services, but, despite a determination that her situation presented an emergency, no such services have been offered.  Even if she were accepted for residential services, the existing services would not be appropriate to her needs, because of her deafness.  The DMH Regional Office has no residential placement opportunities appropriate for deaf people.

(d)     In 2008, Bumphrey's service coordinator at Progressive Community Services learned that the Missouri Division of Vocational Rehabilitation closed her case because she had acted out.  At that time, the service coordinator contacted defendant Winslow and requested information and referrals for mental health services for Bumphrey.  Winslow did not, however, refer Bumphrey to a deaf treatment qualified mental health professional.  Nor did Progressive Community Services refer her to one.

38

(e)     For several months during 2009, Bumphrey received treatment from a mental health professional at the Northwest Behavioral Health Services ("Northwest Behavioral") in St. Joseph, which receives federal financial assistance under the Medicaid Program and other federal programs, such as Medicare, and lists among its community partnerships, Family Guidance Center, which is an administrative agent of DMH. But none of the treating professionals she saw there were deaf treatment qualified mental health professionals.

(f)     Defendants have not afforded Bumphrey with mental health services that secure her rights under Title II of the ADA and Section 504 of the RA; they have violated her rights under those statutes.

50.     Plaintiff Mosley:

(a)     Mosley has been diagnosed with Adjustment Disorder with mixed disturbance of emotions and conduct. He has been seeing mental health professionals for more than four years to deal with his anger problems and inability to control his temper.

(b)     Mosley receives Social Security Disability and Medicaid benefits. For three years, until approximately June 2008, Mosley was treated by a counselor in St. Joseph, Missouri, who was fluent in ASL and knowledgeable about Deaf Culture. That counselor moved away. Mosley resumed his mental health treatment in May 2009 with a mental health professional at Northwest Behavioral Health Services in St. Joseph ("Northwest"). Northwest receives federal financial assistance under Medicaid and other federal programs, such as Medicare, and lists among its community partnerships, Family Guidance Center, which is an administrative agent of DMH. And Mosley's services at Northwest were paid for by Medicaid.

(c)     The mental health professional who treated Mosley at Northwest was not a deaf treatment qualified mental health professional because he did not utilize qualified interpreters

39

and/or for other reasons. For this reason, Mosley did not receive mental health services at Northwest in compliance with Title II of the ADA and Section 504 of the RA. Mosley was thereby subject to some of the policies and practices described in ¶38 above. In any event, the therapy afforded Mosley at Northwest had little or no efficacy and the mental health professional there terminated his services after five sessions.

(d)     Defendants have not afforded plaintiff Mosley mental health services that secure his rights under Title II of the ADA and Section 504 of the RA; they violated his rights under those statutes.

51.     Plaintiff Politte:

(a)     Politte is mentally ill, and periodically is badly in need of mental health treatment. He experiences depression and suicidal thoughts, and is very anxious, among other things. He also has abused drugs and alcohol. His relationship with his (third) wife is very poor. She (his wife) has filed for divorce, and obtained an order of protection against Politte. Politte also has been charged with a misdemeanor for allegedly assaulting his wife.

(b)     Politte receives Social Security Disability and Medicare benefits. In late 2009, his marriage failing and being depressed because of, among other things, the suicide of a deaf friend, Politte sought to identify, in the St. Louis metropolitan area, where he resides, a signing mental health professional knowledgeable about Deaf Culture. In pursuit of this goal, he searched through the internet, contacted numerous social service agencies, including BJC Behavioral Health, an administrative agent of DMH, and spoke with others with knowledge of services for deaf people in the community. His search, however, was completely unsuccessful as he did not identify a single such mental health professional in the entire St. Louis metropolitan area or even just a mental health professional who had ready access to a qualified interpreter.

(c)     Finding no signing mental health professional or mental health professional who had ready access to qualified interpreters, and becoming suicidal, Politte checked into St. John's Mercy Hospital ("St. John's") as an inpatient in December 2009 for treatment of his mental illness. The duration of his stay at St. John's was approximately two weeks. St. John's receives federal financial assistance under Medicaid and other programs, such as Medicare. Indeed, Medicare paid most of the expenses incurred in connection with Politte's hospitalization there.

(d)     St. John's provided Politte an interpreter every day from 10 a.m. to 3 p.m. for purposes of permitting individual counseling sessions with a mental health professional and some group therapy sessions held during these hours. But it never afforded Politte a deaf treatment qualified mental health professional for any purpose. Also, while his mental health professional at St. John's recommended that he attend group therapy sessions other than those held between 10 a.m. and 3 p.m., St. John's failed to provide Politte a sign language interpreter other than during that five-hour period of the day, making it impossible for Politte to participate in any group therapy sessions at other times.

(e)     Since Politte's discharge from St. John's, he has unsuccessfully sought to identify a deaf treatment qualified mental health professional to treat him.

(f)     Defendants have not afforded plaintiff Politte mental health services that secure his rights under Title II of the ADA and Section 504 of the RA; they have violated his rights under those statutes.

### E.     The Challenged Policies and Practices as Applied to the Plaintiff Class Members

52.     The plaintiff class members have been subjected to, are being subjected to, and, unless appropriate relief is afforded them in this case, will continue to be subjected to one or more of the policies and practices described in ¶38 above, much as the representative parties have been

41

subjected to, are being subjected to, and unless appropriate relief is afforded them in this case, will continue to be subjected to, to one or more of the same policies and practices, as described in ¶¶39-51 above

## V.    Claims

### A.    The ADA Claim

53.    Title II of the ADA provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity.

42 U.S.C. §12132

54.    Federal Regulations implementing Title II provide, among other things, as follows:

> A public entity, in providing any aid, benefit or service, may not, directly or through contractual arrangements, on the basis of disability–
>
> ***
>
> (ii)    Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others;
>
> (iii)    Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

28 C. F. R. §35.130 (b)(1)(ii)(iii).

55.    All plaintiff class members are qualified individuals with a disability within the meaning of Title II of the ADA, 42 U.S.C. §12132, their disability being deafness.

56.    The DMH and DSS are public entities within the meaning of Title II of the ADA, 42 U.S.C. §12132.

42

57.    By their policies and practices described in ¶38 above, defendants have violated,  are

violating and, unless appropriate relief is afforded plaintiffs in this case, will continue to violate the

rights of the plaintiff class members under Title II of the ADA, 42 U.S.C. §12131-12134, and its

implementing regulations.

**B.    The RA Claim**

58.    Section 504 of the RA, provides:

> No otherwise qualified individual with a disability in the United
> States . . . shall, solely by reason of her or his disability, be excluded
> from participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving federal
> financial assistance.

42 U.S.C. §794(a).

59.    Federal Regulations implementing the RA provide, among other things, as follows:

> (a)     No qualified handicapped person, shall, on the basis of
> handicap, be excluded from participation in, be denied the benefits
> of, or otherwise be subjected to discrimination under any program or
> activity that receives or benefits from federal financial assistance.

> (b)(1)   A recipient [of federal financial assistance] in providing any
> aid, benefit, or service, may not, directly or through contractual,
> licensing, or other arrangements, on the basis of handicap:

> (i)     Deny a qualified handicapped person the opportunity to
> participate in or benefit from the aid, benefit, or service;

> (ii)    Afford a qualified handicapped person an opportunity to
> participate in or benefit from the aid, benefit, or service that is not
> equal to that afforded others;

> (iii)   Provide a qualified handicapped person with an aid, benefit,
> or service that is not as effective in affording equal opportunity to
> obtain the same result, to gain the same benefit, or to reach the same
> level of achievement as that provided to others;

28 C.F.R. §41.51

60. All plaintiff class members are qualified individuals with a disability within the meaning of Section 504 of the RA, 42 U.S.C.§ 794(a), their disability being deafness.

61. All programs DMH administers are ones receiving federal financial assistance within the meaning of Section 504 of the RA, 42 U.S.C.§794(a). The Medicaid program, which DSS administers, for which many plaintiff class members are eligible, is also a program receiving federal financial assistance within the meaning of Section 504 of the RA, 42 U.S.C.§794(a).

62. By their policies and practices described in ¶38 above, defendants have violated, are violating and, unless appropriate relief is afforded plaintiffs in this case, will continue to violate the rights of the plaintiff class members under Section 504 of the RA, 42 U.S.C. §794, and its implementing regulations.

## VI. Irreparable Injury/No Adequate Remedy at Law

63. As a proximate result of these challenged policies and practices, the plaintiff class members: have suffered, are suffering, and, unless appropriate relief is afforded them in this case, will continue to suffer substantial and irreparable injury, including: discriminatory treatment on account of their being deaf; the denial to them of mental health services that secure their rights under Title II of the ADA and Section 504 of the RA; the deterioration of their mental health. Such injury being irreparable, there is no adequate remedy at law for them.

## VII. Relief

WHEREFORE plaintiffs Pray for an ORDER providing the following relief.

A. Declaring that defendants have violated and are violating the rights of the plaintiff class members under Title II of the ADA, 42 U.S.C. §§12131-12134, and Section 504 of the RA, 42 U.S.C. §794.

B.      Enjoining defendants from putting into effect, maintaining, or allowing policies and practices that:   serve to exclude the plaintiff class members, based on their deafness, from participation in or the benefits of the services, programs and activities that defendants administer; subject plaintiff class members, based on their deafness,  to discrimination in violation of the ADA and RA.

C.      Enjoining defendants from failing to put into effect and  maintaining policies and practices as will ensure that the plaintiff class members:  participate fully in and are not denied the benefits of  the services, programs, or activities that defendants administer; are not subject to discrimination  in violation of the ADA and RA based on the class members' deafness.

D.      Awarding plaintiffs their reasonable attorneys' fees and costs.

E.      Awarding plaintiffs any other relief the court deems appropriate.

Respectfully submitted,


 s/Kenneth M. Chackes
One of the Attorneys for Plaintiffs

Kenneth M. Chackes
Chackes, Carlson & Spritzer, LLP
230 S. Bemiston Ave. Suite 800
St. Louis, MO 63105
Phone: 314-872-8420
Fax: 314-872-7017
kchackes@ccsg-law.com


Robert E. Lehrer
Law Offices, Robert E. Lehrer
36 S. Wabash Ave. Suite 1310
Chicago, IL 60603
Phone: 312-332-2121
Fax: 312-422-0708
rlehrer@rlehrerlaw.com

Thomas E. Kennedy, III, LLC
230 S. Bemiston Ave.  Suite 800
St. Louis, MO 63105
Phone: 314-872-9041
Fax: 314-872-9043
tkennedy@tkennedylaw.com

John J. Amman
Legal Clinic
Saint Louis University School of Law
700 Lindell Boulevard
St. Louis, MO 63108
Phone:  314- 977-2796
Fax: 314-977-3334.
ammannjj@slu.edu


Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Amended Complaint was served upon the following attorneys for defendants by filing same electronically with this Court on May 21, 2010:

Denise LeAnne Thomas
Mark Long


   s/Kenneth M. Chackes