# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI, CENTRAL DIVISION

| | | |
|---|---|---|
| Christine Comas et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2-10-cv-04085-MJW |
| | ) | |
| Keith Schafer, Director, etc. | ) | |
| | ) | |
| Defendants. | ) | |

## SETTLEMENT AGREEMENT

WHEREAS, plaintiffs, who are described below, have filed a class action lawsuit ("Lawsuit") against defendants, who are also described below;

WHEREAS, the Lawsuit challenges, as violative of Title II of the Americans with Disabilities Act, 42 U.S.C.§§12131-12134 ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.§794 ("RA"), interrelated policies, practices, procedures, customs and usages (collectively, "policies and practices") of the defendants concerning the delivery of mental health services to deaf persons in Missouri;

WHEREAS, the challenged policies and practices are, it is alleged, ones that subject plaintiffs to substantial and continuing injury;

WHEREAS, defendants have denied and continue to deny all of plaintiffs' allegations of violations of law and of injury, and make no admission of wrongdoing and no admission of liability in the Lawsuit;

WHEREAS, plaintiffs and defendants have a shared interest in ensuring the delivery of mental health services to plaintiffs in a manner respecting their rights under the ADA and the RA;

1

WHEREAS, 28 C. F. R. §35.130(b)(1)(i)-(iii) states that a public entity (as defined in the ADA), in providing any aid, benefit and service, "may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."

WHEREAS, plaintiffs and defendants, to further their described shared interest and to avoid the substantial burden and uncertainty of prolonged litigation, have decided to resolve the differences the Lawsuit has put at issue by entering into this settlement agreement ("Agreement");

WHEREAS, by entering into the Agreement, defendants make no admission of wrongdoing and no admission of liability in the Lawsuit and neither the Agreement nor the court's approval of the Agreement, if any, may be construed as an adjudication of defendants' liability in the Lawsuit,

Plaintiffs and defendants hereby agree as follows:

## I. Jurisdiction and Venue

1. If the court approves the Agreement pursuant to Fed. R. Civ. P. 23(e), the parties anticipate that the order approving it will find that the court has jurisdiction over the Lawsuit

2

pursuant to 28 U.S.C.§§1331, 1343(3)(4), and that venue is proper in the Western District of Missouri pursuant to 28 U.S.C.§1391.

## II.    Definitions

1.    As used herein, the following terms have the meanings indicated.

(a)    "administrative agents," means community mental health centers (including affiliated centers) throughout Missouri with which DMH contracts to provide mental health services to plaintiffs. (There are currently 25 such administrative agents in Missouri, associated with 25 service areas that the DMH has established).

(b)    "ASL fluent" or "ASL fluency" means any one or more of the following measures or attestations of fluency in American Sign Language: (i) for clinicians, an "advanced" or higher rating standard Sign Language Proficiency Interview, see http://www.rit.edu/ntid/slpi/; (ii) for non-clinicians, an intermediate or higher rating on the standard SLPI rating scale, see id.; (iii) for clinicians and non-clinicians, graduation from any post-secondary educational program, such as one at Gaullaudet University, that uses sign language as a primary language of instruction or being prelingually deaf and using ASL as their primary language; (iv) written attestations of ASL fluency by two individuals who have an advanced plus or higher rating on the standard SLPI rating scale, or who are certified as a sign language interpreters at level 4 or 5 by the Missouri Commission on the Deaf, or who are prelingually deaf instructors of ASL, or who are graduates of any post-secondary educational program, such as one at Gallaudet University, that uses sign language as a primary language of instruction, or who are prelingually deaf and use ASL as their primary language. The attestations shall be based on these individuals' in person or videophone conversation in ASL (of not less than 15 minutes duration) with a person seeking recognition by

3

the DMH defendants as ASL fluent, the attestation being that, in the opinion of the attesting individual, the individual seeking recognition is ASL fluent.

(c)  "category of mental health service" means one of the following five such services: an initial assessment, including diagnosis; a periodic reassessment; a case management service, including treatment planning and discharge planning; an individual psychotherapy/psychoeducational session; a group psychotherapy/psychoeducational session.

(d)  "clinician" means a qualified mental health professional, as defined in 9 CSR 10-7.140 (QQ).

(e)  "community placement," means a residential facility operated by DMH or an administrative agent, at which one or more plaintiffs reside;

(f)  The parties having consented, pursuant to 28 U.S.C. §636 (c), to the exercise of any and all proceedings in this civil matter by Magistrate Judge Matt Whitworth, of the United States District Court for the Western District of Missouri, and the case having been reassigned to him, "court" means Judge Whitworth or his successor as a Magistrate Judge of the United States District Court for the Western District of Missouri.

(g)  "deafness" means an inability, because of a hearing loss, to discriminate speech when spoken in a normal conversational tone regardless of the use of amplification devices.

(h)  "defendants" mean the DMH defendants and the DSS defendants, as described in ¶III.3 below.

(i)  "DMH facilities" means any facilities directly operated by DMH, if such facilities are ones providing outpatient or inpatient mental health services to plaintiffs.

(j)  "identify," when used with respect to staff at DMH facilities and administrative

4

agents, other than qualified interpreters, means to designate the person by name, job title, and DMH facility or administrative agent (including address) with which the person is associated. "Identify," when used with respect to staff at community placements, means to designate the person by name, job title, community placement (including address) with which the person is associated. "Identify," when used with respect to qualified interpreters, means to designate the person by name and, if the interpreter affiliated with a sign language interpreter agency, by the name of that agency and its address.

(k)     "interpreter category of care communications" means communications between clinical or other staff of a DMH facility or administrative agent and a plaintiff when the communications attend a category of mental health service.

(l)     "mental health services," means any and all services for the diagnosis and/or treatment of a plaintiff's mental illness, as authorized by rules promulgated by DMH in the Code of State Regulations.

(m)     "onset reporting date" means the first day of the calendar month following the effective date of the Agreement.

(n)     "plaintiffs" means all members of the plaintiff class, as defined in Exhibit A, and the Missouri Association of the DEAF ("MoAD"), except that nothing in the Agreement should be construed as defendants' agreement to provide mental health services to MoAD as an organization. The definition of the plaintiff class in Exhibit A is as follows.

All persons residing in Missouri on or after April 26, 2005 who: (a) have been, are, or will be deaf, that is, are persons who because of a hearing loss, are not able to discriminate speech when spoken in a normal conversational tone regardless of the use of amplification devices; and (b) have been, are, or will be eligible for services, from or through the Missouri Department of Mental Health and/or the Missouri Department of Social Services (including from administrative agents of

5

DMH), that diagnose mental illness and/or treat it.

(o)    "Qualified Interpreters" means ASL interpreters certified at levels 4 or 5 by the Missouri Commission for the Deaf.

(p)    "residential placement" means a residential facility licensed, certified, or paid for (but not operated) by DMH or an administrative agent at which one or more plaintiffs reside;

(q)    "Specialized Outpatient Center" means a program operated by DMH or one or more administrative agents designated by DMH, which program employs staff specifically trained regarding the provision of mental health services to deaf consumers, and having the capacity to provide such services by ASL fluent clinicians and others.

(r)    "St. Louis Center" means the St. Louis Psychiatric Stabilization Center.

(s)    "Staff" includes employees of DMH facilities or administrative agents or Specialized Service Centers or Deaf Inpatient Units or community placements or residential placements (as provided for under the Agreement), but also independent contractors (including qualified interpreters) affiliated with DMH facilities or administrative agents, or such Centers or Units or placements, except if such staff performs solely clerical functions.

## III.    The Parties

1.    The 13 individual plaintiffs and representative parties, which are or who include adults and children, are citizens of Missouri who are deaf or hard of hearing ("deaf") and who also suffer from mental illness.  MoAD, a nonprofit corporation, many of whose members are deaf, is also a plaintiff.

2.    For settlement purposes only, defendants agree to the certification of a plaintiff class pursuant to Fed. R. 23(a), (b)(2) and (c)(1), as defined in the (draft) Order attached hereto

6

as Exhibit A, and in ¶II.1 (n) above. For settlement purposes only, defendants also agree to the appointment of three of plaintiffs' counsel (Kenneth M. Chackes, Robert E. Lehrer, and John J. Ammann), as class counsel, pursuant to Fed. R. Civ. P. 23(g).

3.  The defendants initially named or who have been automatically substituted as a defendant pursuant to Fed. R. Civ. P. 25(d) are: the "DMH defendants," which are or who include the Missouri Department of Mental Health ("DMH"), its Director, Keith Schafer, in his official capacity; the "DSS defendants," which are or who include the Missouri Department of Social Services ("DSS") and its Interim Director, Brian Kinkade, in his official capacity.

## IV.   Defendants' Duties Under the Agreement

### Coordinator of the Statewide System of Care

1.  Within nine months of the effective date of the Agreement, unless plaintiffs' counsel agree to an extended date, the DMH defendants shall hire either: (a) a full-time State Coordinator for Deaf Services ("Coordinator"); or two regional coordinators for Deaf Services ("Regional Coordinators"). Whether a (single) Coordinator is or two Regional Coordinators are hired, (s)he or they shall be responsible for coordinating the system of care for plaintiffs established and maintained under this Agreement. If two Regional Coordinators are hired, they shall each be responsible for coordination of the system of care for plaintiffs and they shall confer regularly and otherwise make all reasonable good faith efforts to establish a system of care for plaintiffs that is uniform throughout the state, insofar as such uniformity is practicable. This coordination responsibility shall include, but not be limited to, the establishment of procedures facilitating reports to the Coordinator or Regional Coordinators (by a plaintiff or plaintiff's representative) of alleged departures, in individual cases, from policies and practices provided for

7

under the Agreement, and the Coordinator or Regional Coordinators shall investigate such alleged departures and, if (s)he or they conclude that there have been such departures, recommend remedial action in the individual case addressing the departure. The Coordinator position shall be a full-time position, full-time meaning that the Coordinator's responsibility for coordinating the system of care for plaintiffs established under this Agreement shall not be fractionated to include other responsibilities. The Regional Coordinator positions shall be half-time positions, half time meaning that the Regional Coordinators must spend at least half of the hours he or she would spend if the position were a full time one discharging his or her responsibilities as a Regional Coordinator. The Coordinator or the Regional Coordinators hired shall report directly to the DMH Deputy Director, who, among other things, is charged with making all reasonable good faith efforts to establish a system of care for plaintiffs that is uniform throughout the state, insofar as such uniformity is practicable. The Coordinator or the Regional Coordinators hired must be ASL fluent and have a masters degree in a clinical discipline, with hiring preference being given to any applicant who has clinical or administrative experience in the delivery of mental health or other services to deaf persons. By agreement with plaintiffs' counsel, however, based on the number and quality of the applications for the Coordinator or the Regional Coordinator positions, the DMH defendants may hire for such a position or positions an applicant who does not meet the minimum requirements for the position set forth in this paragraph.

2.    The DMH defendants, by the DMH Deputy Director, retain full and final decision making authority respecting the hiring of the Coordinator or the Regional Coordinators. However, an individual whom plaintiff MoAD ("MoAD") designates ("MoAD designee") shall

8

be a member of the Hiring Committee ("Committee") for the selection of the Coordinator or Regional Coordinators. The DMH Deputy Director shall name the other members of the Committee. All members of the Hiring Committee serve at the pleasure of the DMH Deputy Director, except that, if the MoAD designee is, for any reason, unable to serve on the Committee, then MoAD shall be entitled to designate another MoAD designee acceptable to the DMH defendants to serve on the Committee. The Committee shall be responsible for reviewing all applications for the Coordinator and Regional Coordinator positions, for determining whom to interview, for conducting the interviews and for making recommendations to the DMH Deputy Director (including a recommendation as to whether to hire a single Coordinator or Regional Coordinators) who, while retaining final decision making authority respecting the hiring of the Coordinator, is to give substantial weight to the recommendation(s) of the Committee.

3.     On or before February 1 of each calendar year, beginning with calendar year 2013, and for the duration of the Agreement, the Coordinator or the Regional Coordinators (jointly), shall submit to the DMH Deputy Director a written report on the performance of defendants' duties (including the activities of the Coordinator or the Regional Coordinator), under this Agreement during the preceding calendar year (or so much of the preceding calendar year that postdates the effective date of the Agreement). The Report should also include any recommendations of the Coordinator for the more effective and efficient delivery of mental health services to the plaintiff class, such as the opening of additional facilities or the expansion of existing ones to serve the plaintiff class, taking into account any financial constraints. This report shall be served on plaintiffs' counsel promptly after its submission to the DMH Deputy Director.

9

**Standards of Care**

4.     Within 120 days of the effective date of the Agreement, the DMH defendants, by the DMH Deputy Director, shall issue standards of care for the provision of interpreters to plaintiffs ("Clinical Standards of Care"). The Clinical Standards of Care shall provide that, except with respect to communications between an ASL fluent clinician or other ASL fluent staff and a plaintiff, qualified interpreters should be provided when a plaintiff is receiving a category of mental health service, unless it is determined that a plaintiff does not use ASL to communicate. The Clinical Standards of Care shall take into consideration that not all plaintiffs use ASL to communicate and that it will be necessary to make reasonable good faith efforts to provide alternative communication methods for those plaintiffs when receiving a category of mental health service.

5.     The Clinical Standards of Care shall be issued as Department Operating Regulations (DORS) and, as such, are applicable to all DMH facilities. After the issuance of the Clinical Standards of Care, the DMH defendants shall make all reasonable good faith efforts to ensure obedience to them by the DMH facilities.

6.     The Clinical Standards of Care shall be made part of the operating contracts between DMH and its administrative agents and administrative agents shall be required by such operating contracts to make the Clinical Standards of Care part of their (the administrative agents') operating contracts or agreements with any entity (including subcontractors and independent contractors) that, by agreement with such administrative agents, provides mental health services to plaintiffs. After the Clinical Standards of Care are made part of the operating contracts, the DMH defendants shall make all reasonable good faith efforts to ensure obedience

10

to them by the administrative agents and any entity (including subcontractors and independent contractors) that, by agreement with such administrative agents, provides mental health services to plaintiffs.

7. Only DMH facilities and administrative agents are subject to the Clinical Standards of Care. The DMH and DSS defendants shall, within 14 days after issuance of the Clinical Standards of Care, place and thereafter maintain a notice on their respective websites that is entitled "Mental Health Services to Medicaid-Eligible Deaf Persons" or "Community Psychiatric Rehabilitation Program Services to MO HealthNet Eligible Deaf Persons." The same notice shall be included in the Provider Bulletin that first follows the posting of the notices on the respective websites. This notice shall inform the Medicaid providers of the existence of the Clinical Standards of Care and of the system for the delivery of mental health services to plaintiffs maintained pursuant to the Agreement. The notice shall also state that, if a Medicaid provider is of the view that it is unable to meet the needs of a plaintiff for mental health services, it may wish to consult with a DMH facility or administrative agent to ascertain whether such a facility or agent or provider could provide services meeting such needs. The notice on the respective websites and in the Provider Bulletin shall include links to the names, addresses, phone numbers and "contact us" e-mail addresses (if any), of all DMH facilities and administrative agents or the url address at which such names, addresses, phone numbers, and e-mail addresses may be found.

**Community Services**

8. Within nine months of the effective date of the Agreement, the DMH defendants shall open and they shall thereafter maintain a Specialized Outpatient Center and within 18

11

months of the effective date of the Agreement, the DMH defendants shall open and they shall thereafter maintain at least one additional Specialized Outpatient Center. These centers shall be deemed to have been opened when they are fully staffed and providing mental health services to plaintiffs.

9. The DMH defendants shall make all reasonable good faith efforts to ensure that all clinicians, case managers and case manager assistants at the Specialized Outpatient Center(s) are ASL fluent, as determined by the DMH defendants pursuant to ¶1V.17 below. If the persons hired for these positions are not ASL fluent, however, they shall be required to complete the Deaf Services Training Program described in ¶ IV.16(a) below in a timely manner, unless their completion of all or part of that program is waived pursuant to ¶1V.17 below on grounds other than ASL fluency.

10. The Specialized Outpatient Center(s) shall provide mental health services on site to plaintiffs needing them or, to plaintiff outpatients being served by or through administrative agents, by a tele-health network that the DMH defendants shall maintain, meaning a video network connecting each administrative agent with the Specialized Outpatient Center(s), by consumer platforms (such as Sorenson VP 200 or Z-340) at each such administrative agent.

11. Any plaintiff may seek outpatient mental health services on site at the administrative agent in his or her service area, or on site at the Specialized Outpatient Center(s). Plaintiffs seeking outpatient mental health services at an administrative agent may, however, also elect to receive such services through the Specialized Outpatient Center(s) via the tele-health network described in the preceding paragraph.

12. For the duration of the Agreement, the DMH defendants shall facilitate residential

12

placements for all plaintiffs for whom such a placement is appropriate. To the extent that a plaintiff desires a community placement and there are available and appropriate community placements, preference will be given to finding a community placement for eligible plaintiffs. Facilitation of such residential placements may require the establishment of residential placements not now in existence, and the DMH defendants will work with community providers to establish such additional placements as meet the needs of the plaintiffs and to the extent that financial resources permit. The DMH defendants shall also afford each plaintiff who is currently eligible for services in a community placement ready access to clinicians at the administrative agent serving the locale of that placement and, through the tele-health network or otherwise, to clinicians at the Specialized Outpatient Center(s).

13. The DMH defendants shall make all reasonable good faith efforts to ensure that there are staff assigned to each community placement in which a plaintiff resides who are ASL fluent and shall encourage residential placements to hire staff that are ASL fluent. If, however, no staff assigned to any community placement are ASL fluent as determined by the DMH defendants pursuant to ¶1V.17 below, then one among the staff assigned to that placement shall be required to complete the Deaf Services Training Program described in ¶IV.16(a) below within 60 days of the day a deaf person first resides there, unless their completion of all or part of that program is waived pursuant to ¶1V.17 below on grounds other than ASL fluency. A community placement may not be denied to a plaintiff as a means of avoiding the requirement that at least one among the staff assigned to a community placement in which a plaintiff resides complete the Deaf Services Training Program, if no one among the staff assigned to that placement is ASL fluent. If there are no staff assigned to a residential placement who are ASL fluent, the DMH

13

defendants will encourage the residential placement to have one among the staff assigned to that placement complete the Deaf Services Training Program described in ¶IV.16(a) below within 60 days of the day a plaintiff first resides there.

**In-Patient Care**

14. Within nine months of the effective date of the Agreement, the DMH defendants shall open and thereafter maintain one or more inpatient deaf services units ("Inpatient Deaf Services Units"), to afford services to plaintiffs requiring acute or long-term care. The DMH defendants anticipate that all plaintiffs requiring such care will be served by such units, except for plaintiffs required to be in high security settings or when emergency circumstances make the provision of such care at such units temporarily impossible. If the beds in such units are also beds that may be utilized by persons who are not plaintiffs, then plaintiffs shall be afforded equal access to the beds as persons who are not members of the plaintiff class but are otherwise similarly situated to plaintiffs in terms of their need for acute or long term care. If the beds in such units are also beds that may be utilized by persons who are not plaintiffs, then a plaintiff in need of such a bed may not be denied such a bed unless the unit is at its full capacity. An Inpatient Deaf Services Unit shall be deemed to have been opened when it is fully staffed and providing mental health services to plaintiffs.

15. The DMH defendants shall make all reasonable good faith efforts to ensure that all clinicians, case managers and case manager assistants at the Deaf Inpatient Services Units are ASL fluent, as determined by the DMH defendants pursuant to ¶1V.17 below, except that, by agreement with plaintiffs' counsel, based on the number and quality of the applications for such positions, the DMH defendants may hire for such positions persons who are not ASL fluent. If

14

the persons hired for these positions are not ASL fluent, however, they shall be required to complete the Deaf Services Training Program training described in ¶IV.16(a) below in a timely manner, unless their completion of all or part of that program is waived pursuant to ¶IV.17 below on grounds other than ASL fluency.

**Training**

16(a)  Subject to state procurement laws and practice, including laws and practice relating to best and final offers, amendments to RFPs and rejection of any and all bids, the DMH defendants shall underwrite and make available to the persons described in subparagraph (b), a Deaf Services Training Program ("Deaf Services Training Program" or "Training Program") described in this subparagraph (a), as approved by the DMH defendants, on the following schedule. Within 30 days of the effective date of the Agreement, the DMH defendants shall issue an RFP for the Training Program, requiring bids responsive to the RFP within 30 days thereafter. The RFP shall solicit bids by persons or entities with experience and expertise in the provision of training programs for professionals, including clinicians and interpreters, working with deaf persons.  The DMH defendants shall make a contract award based on the bids within 120 days after the date timely bids are received, and the start date for training program shall be 60 days after the contract award.  The DMH defendants shall select the lowest and best bidder considering price, experience, expertise and all other evaluation criteria specified in the RFP, to develop the Training Program if the bid price is reasonable, meaning $20,000 or below.  The Deaf Services Training Program shall cover the following areas:  Deaf Culture; ASL, including its features, its significance in the deaf community, and the ASL skill variance in the deaf population; medical and psychosocial aspects of the deaf population; English fluency limitations

15

in the deaf community, including speech reading and reading/writing limitations; fund of information limitations in the deaf community; how diagnosis treatment effectiveness and treatment efficacy differ in regard to deaf vs. hearing individuals; effective working relationships between interpreters and clinicians. The date the Training Program is made available to the persons required to complete the Training Program is referred to as the "Training Availability Date." The Training Program, which, subject to the waiver provision at ¶IV.17 below, must be of at least 12 hours duration, with components that can be completed in 2 hour blocks, may be entirely web based, thus avoiding the need for persons required to complete it to travel to distant locales for in person training or for them or DMH to bear travel and lodging expenses.

(b)  Except if the DMH defendants waive completion of the Training Program pursuant to ¶IV.17 below, the following persons shall be required to complete this program in a timely manner: clinicians, case managers, case manager assistants, and other non-clerical staff at a Specialized Outpatient Centers or the Deaf Inpatient Services Units; any staff at a community placement required to complete the Training Program pursuant to ¶IV.13 above. The DMH defendants may not charge persons required to complete the Deaf Services Training Program to pay for the Training Program, and, if such persons are full or part time DMH employees must permit them to complete such training on work time.

(c)  The following persons shall be encouraged by the DMH defendants to complete the Training Program in a timely manner: any clinician providing or wishing to provide mental health services to plaintiffs and employed by or affiliated with an administrative agent, or the St. Louis Center. As to the administrative agents, "encouraged" as used in this paragraph means at least that the DMH defendants shall, by its operating contracts with the administrative agents:

16

require the administrative agents themselves to encourage such clinicians timely to complete the Training Program; forbid the administrative agents from prohibiting such clinicians from taking the Training Program; encourage the administrative agents to permit clinicians employed by or affiliated with them and electing to complete the Training Program to do so on work time. As to the St. Louis Center, "encouraged" as used in this paragraph means at least that the DMH defendants shall, by a communication to the Chief Executive Officer of the St. Louis Center: urge the Center to encourage clinicians employed by or affiliated with the Center timely to complete the Training Program; encourage the Center to permit clinicians employed by or affiliated with them and electing to complete the Training Program to do so on work time. The DMH defendants shall also make known the availability of the Training Program by a notice prominently posted on the DMH website with a link to the materials that are publicly available as described in ¶16(g) below.

(d)    Timely completion of the Training Program by an individual required to complete it under ¶16(b) above means that the individual complete it within 60 days after the Training Availability Date, unless the individual starts employment at a Specialized Outpatient Center or at the Deaf Inpatient Services or community placement on or after the Training Availability Date, in which case a "timely manner" means that the individual so starting employment must complete the Training Program within 60 days of his or her start date.

(e)    Timely completion of the Training Program by a clinician providing or wishing to provide mental health services to plaintiffs and employed by or affiliated with an administrative agent or the St. Louis Center and electing to take the training means that the individual completes the training within 60 days of the date (s)he elects to do so.

17

(f)     The DMH defendants shall make all reasonable good faith efforts to ensure that the following persons complete the Training Program in a timely manner: all persons required to complete the Training Program; all clinicians employed by or affiliated with an administrative agent or the St. Louis Center who elect to take such training.

(g)     The DMH defendants shall make the written materials of the Training Program available to the public on the DMH website and shall include a link to any video content included in the Training Program.

17(a)   The DMH defendants, by the DMH Deputy Director or the Coordinator or Regional Coordinators, are charged with determining whether applicants for staff position or existing staff are ASL fluent in accordance with the criteria set forth in ¶II.1(b) above. The DMH defendants shall post on the DMH website and provide to any individual requesting it, information about how staff seeking recognition by the DMH defendants as ASL fluent may do so. To discharge its responsibility to determine ASL fluency among applicants for staff positions or existing staff, and to encourage staff to establish their ASL fluency by achieving the designated rating (in ¶II.1(b)(i) and (ii)) on the SLPI rating scale, the DMH defendants may also contract with persons to administer (at DMH expense) SLPI in Missouri to applicants for staff positions or existing staff.

(b)     The DMH defendants, by the DMH Deputy Director or the Coordinator or the Regional Coordinators, shall waive completion of the Deaf Services Training Program for all persons they determine to be ASL fluent in accordance with the criteria set forth in ¶II.1(b) above. They may also waive completion of all or part of the Deaf Services Training Program for all persons otherwise required to complete it under this Agreement, if, in the opinion of said

18

DMH Deputy Director or Coordinator or Regional Coordinator, the person seeking a waiver has already completed substantially similar training or has such substantial experience working with deaf persons that taking the Training Program is unnecessary or completion of one or more components but less than all components of the Training Program is appropriate. All waivers shall be in writing.

**Interpreters**

18. The DMH defendants shall ensure the timely provision of qualified interpreters to plaintiffs in accordance with the Clinical Standards of Care (applicable to all DMH facilities and administrative agents only).

19. When a qualified interpreter is being provided in accordance with the Clinical Standards of Care, and the plaintiff and the clinician or others with whom the plaintiff is communicating are in the same locale, then the qualified interpreter is expected to be physically present at that locale. However, if a qualified interpreter cannot be physically present in a timely manner and the Clinical Standards of Care require that a qualified interpreter be utilized, then the DMH defendants shall provide, in a timely manner, a qualified interpreter through a Video Remote Interpreting ("VRI") system that it shall establish not later than three months following the effective date of the Agreement, and thereafter maintain such system. The VRI system shall be such that it shall be available for use at all DMH facilities and all administrative agents.

20. The DMH defendants shall make available to qualified interpreters, and publicize among qualified interpreters, a training program underwritten in part and approved by the DMH defendants and covering the topic of interpreting in mental health settings ("Interpreter Training Program"). Subject to state procurement laws and practice, including laws and practice relating

19

to best and final offers, amendments to RFPs and rejection of any and all bids, the DMH defendants shall make available to qualified interpreters the Interpreter Training Program on the following schedule. Within 30 days of the effective date of the Agreement, the DMH defendants shall issue an RFP for the Interpreter Training Program, requiring bids responsive to the RFP within 30 days thereafter. The RFP shall solicit bids for the development of the Interpreter Training Program by persons or entities with demonstrated experience and expertise in the provision of training interpreters to interpret in mental health settings, the bid from each bidder being broken down into that for the core component and that for the interactive component, as described below, of the Interpreter Training Program, and the RFP also providing that the successful bidder must identify for DMH all qualified interpreters completing the Interpreter Training Program. The DMH defendants shall make a contract award based on the bids within 120 days after the date timely bids are received, and the start date for training program shall be 60 days after the contract award. The Interpreter Training Program must be of at least 30 hours duration, plus outside readings, and may be entirely web based, thus avoiding the need for persons required to complete it to travel to distant locales for in person training or for them or DMH to bear travel and lodging expenses. However, this program must allow for on line discussions among the qualified interpreter trainees and between them and the trainers. The Interpreter Training Program thus shall have two components: a "core component" that each trainee may complete independently of all other trainees and an "interactive component" that involves on line discussions among the interpreter trainees and between them and the trainers. From among the bidders for the Interpreter Training Program, the DMH defendants shall select the lowest and best bidder considering price, experience, expertise and all other evaluation

20

criteria specified in the RFP, to develop such a Training Program, if the bid price for the core component is reasonable, meaning $12,000 or below. The successful bidder shall be known as the "Interpreter Training Program Entity." The DMH defendants must underwrite the core component of the Interpreter Training Program, but are not obliged to underwrite the interactive component of the Program, the cost of which shall be matter of negotiation between the Interpreter Training Program Entity and the individual interpreter, except that the cost to each interpreter for the interactive component is expected to be approximately $600-900. No qualified interpreter shall be required to complete the Interpreter Training Program, but in contracting with qualified interpreters to interpret for plaintiffs, the DMH defendants shall prefer qualified interpreters who have completed such training over those who have not.

21.     Nothing shall prohibit the DMH defendants from providing to plaintiffs qualified interpreters in circumstances other than those provided for in such Clinical Standards of Care. The DMH defendants will do so if, in their discretion, they are of the view that the provision of qualified interpreters in such other circumstances is necessary to ensure the effective provision of mental health services to plaintiffs.

22.     Any plaintiff may waive the use of a qualified interpreter for specific communications as to which the Clinical Standards of Care provide for the use of such an interpreter, but only by a written waiver, signed and dated by the plaintiff (or the plaintiff's guardian, if any, acting on his or her behalf), which written waiver shall advise the plaintiff of the provisions of the Clinical Standards of Care. Any written waiver may be revoked at any time by a plaintiff or the plaintiff's guardian, but only by a signed and dated written revocation. Any signed and dated written waiver and any signed and dated revocation of a written waiver shall be

21

placed in the plaintiff's medical record.

**Crisis Line**

23.    The Leadership Through Education and Advocacy for the Deaf Institute ("LEAD") currently maintains, at its own expense, a 24 hours a day /seven day a week crisis hotline ("LEAD crisis hotline") for the deaf accessible by Text Telephone ("TTY") or voice.

24.    The DMH defendants agree to publicize the LEAD crisis hotline to the greatest extent practicable, especially in the deaf community. They shall do so by, among other things: posting at least three large (large meaning at least 10" x 12") wall posters about it in all DMH facilities; requiring each DMH administrative agent, by provisions included in its operating contract with DMH, to post at least two large wall posters about it in the main facility of the administrative agent, and if the administrative agent maintains so-called satellite facilities, and a large wall poster about it in the satellite facility; encouraging each operator of a community placement to post at least one large wall poster about it at the placement; encouraging administrative agents to disseminate, as by printed handouts, information about the crisis hotline; publicizing the crisis hotline on the DMH website, including providing a link to LEAD's own crisis hotline webpage.

25.    If the LEAD crisis hotline ceases to exist or reduces the frequency of its operation to less than 24 hours a day/seven days a week, then the DMH defendants shall ensure, though its administrative agents or otherwise, that, in conjunction with the LEAD crisis hotline to the extent it remains operational, or otherwise, that there is maintained a 24 hours a day/seven day a week crisis line with an Access Crisis Intervention ("ACI") system with TTY capacity and access to voice interpretation.    Further, the DMH defendants shall publicize the availability of any

22

replacement crisis line (including one supplementing the LEAD crisis hotline), to the same extent and in the same way as they agree to publicize the LEAD crisis hotline.

**Construction of Provisions**

26. Except as specifically provided otherwise in the Agreement, nothing in it shall be construed to provide or require any changes to, or shall be construed to modify: any of the services, eligibility standards, or programs administered by DMH, DSS, the Missouri Medicaid Program (MO HealthNet Program) and/or provided through the MO HealthNet program (Medicaid program); the authority of DSS, MO HealthNet Division, Financial Services Division, or DMH to administer the programs of Medicaid or of DMH in the manner provided by law.

27. If federal or state law is amended in a manner that requires or permits defendants to adopt a policy or practice that the Agreement prohibits, and defendants intend (or believe they are required) to adopt such a policy or practice, or if federal or state law is amended in a manner that, in defendants' view, makes compliance with one or more provisions of the Agreement impractical or impossible, then defendants shall notify plaintiffs in writing of the amendment in question and of any new policy or practice bearing on the Agreement (including a policy or practice of non-compliance with one or more provisions of the Agreement) they wish to or believe they must adopt in light of such amendment. Plaintiffs and defendants shall thereafter, for a period of 30 days after the written notification, attempt to negotiate a resolution of any differences between them arising out of the amendment giving rise to the notification and concerning any new policy or practice bearing on the Agreement. If the parties are unable to reach an agreement within the 30 day time period, and the defendant(s) decide to proceed with the implementation of the new policy or practice, then the plaintiffs may seek declaratory and/or

23

injunctive relief within 30 days of their having received written notification from defendants, or been otherwise advised, of defendants' decision to proceed with implementation. Provided, however, that, subject to other provisions of this paragraph, if plaintiffs do not seek relief against a new policy or practice that has been the subject of negotiations between the parties for the full 30 day negotiating period (after written notification under this paragraph), within 30 days after the expiration of such negotiating period, plaintiffs shall be deemed to have consented to the adoption of such new policy or practice by defendants and such policy or practice shall be deemed part of the Agreement. Provided further that, if defendants declare their intent to adopt a new policy or practice bearing on the Agreement sooner than 60 days following the written notification required under this paragraph or adopt such a policy or practice within that 60 day period, then plaintiffs may seek appropriate relief from the court respecting such policy or practice, at any time after defendants declare such intent or adopt such a policy or practice. Provided further that, if defendants adopt a new policy or practice bearing on the Agreement but do not give plaintiffs written notification of such policy or practice under this paragraph, and plaintiffs, when the new policy or practice comes to their attention (is discovered by them), are of the view that the new policy or practice violates the Agreement, then plaintiffs shall have five years from the date of their discovery of the new policy or practice (or until termination of the Agreement, if the termination date is sooner than five years) to seek appropriate relief from the court. Provided further, that compliance by the defendants with requirements imposed by a federal statute or regulation enacted after the effective date of the Agreement, which requirements have been determined by the court, shall not be a breach of the Agreement. Provided further, that compliance by the defendants with requirements imposed by a state statute

24

enacted after the effective date of the Agreement, which requirements have been determined by the court and are consistent with federal law, shall not be a breach of the Agreement. Provided further, that if such newly enacted state statute is not specifically directed to the plaintiff class, but has broader applicability, then plaintiffs may not challenge the validity of this statute under the Agreement, but reserve all other remedies to challenge the statute.

## V.    Reporting

1.    Following the effective date of the Agreement, the DMH defendants shall serve upon plaintiffs' counsel the reports described in this ¶V below on the schedule described below. Except as otherwise specified in this §V below, the service date of the reports shall be within 45 days after the close of the relevant reporting period. If the relevant reporting period (*e.g.,* six months) goes past (exceeds) the termination date of the Agreement, then the last report in the relevant series shall cover that part of the last reporting period through the termination date.

(a)    For each six-month period following the onset reporting date, until the opening of each Specialized Outpatient Center and each Deaf Inpatient Services Unit, a report describing, for the preceding six-month period, the steps taken to ensure the timely opening of each such Center and each such Unit. A final report for each such Center and each such Unit shall be served within 45 days after the opening of each such Center and each such Unit.

(b)    In the first six-month report as described in ¶V.1(a) above, copies of the DORS issued and the contractual amendments entered into pursuant to ¶¶IV.5-6 above shall be included.

(c)    For each six-month period following the onset reporting date (with the first report called for by this provision also covering the days between the effective date of the Agreement

25

and the Onset reporting date), and for the duration of the Agreement, a report identifying the persons who completed the Deaf Services Training Program during that period and the persons for whom waivers were granted during that period, pursuant to ¶IV.17 above. This report need not include persons who accessed the Deaf Services Training Program through the publicly available link on DMH's website, but will include all persons who completed the Deaf Services Training Program using DMH's internal training software.

(d)     For each six-month period following the onset reporting date (with the first report called for by this provision also covering the days between the effective date of the Agreement and the Onset reporting date) and for the duration of the Agreement, a report identifying the qualified interpreters who completed the Interpreter Training Program during that period.

(e)     For each six-month period following the onset reporting date beginning with the first day of the calendar month following the opening of each Deaf Inpatient Services Unit, if the Deaf Inpatient Services Unit is open for part or all of that six-month period (with the first report called for by this provision also covering the days between the effective date of the Agreement and the onset reporting date) and for the duration of the Agreement, a report that specifies:  (i) the average daily patient census in the Unit, (ii) the number of days, if any, at which the patient census in the Unit was at or exceeded capacity and what that capacity was; (iii) the average length of stay in the Unit; (iv) the number of individual (differentiated) plaintiffs who signed written waivers of qualified interpreters and how many separate such waivers by all plaintiffs were signed.

(f)     For each six-month period following the onset reporting date beginning with the first day of the calendar month following the opening of a Specialized Outpatient Center, if the

26

Specialized Outpatient Center is open for part or all of that six-month period (with the first report called for by this provision also covering the days between the effective date of the Agreement and the onset reporting date) and for the duration of the Agreement, a report that specifies: (i) the number of individual (differentiated) plaintiffs receiving any category of mental health service, such number to include both plaintiffs receiving such a service through tele-health and on site; (ii) the mental health services, by number and category of mental health service, provided to such plaintiffs collectively; (iii) as to the category of individual psychotherapy/psychoeducational sessions only, the total number of such sessions, broken down by how many were conducted on site and how many through tele-health; (iv) the number of individual (differentiated) plaintiffs who signed written waivers of qualified interpreters and how many separate such waivers by all plaintiffs were signed.

(g)     For each six-month period beginning with the first day of the onset reporting date and for the duration of the Agreement, a report, for each administrative agent, that specifies: (i) the number of individual (differentiated) plaintiffs receiving any category of mental health service, such number to include both plaintiffs receiving such a service through tele-health and on site; (ii) the mental health services, by number and category of mental health service, provided to such plaintiffs collectively; (iii) as to the category of individual psychotherapy/psychoeducational sessions only, the number of such sessions conducted, broken down by how many were conducted on site and how many through telehealth.

(h)     For each six-month period beginning with the onset reporting date, and  for the duration of the Agreement, a report:  (i) specifying (by type of community placement, address, and operator of same) all community placements in which plaintiffs resided for part or all of that

27

period; (ii) identifying any ASL fluent staff at each such community placement; (iii) identifying any persons at each such community placement who completed the Deaf Services Training Program.

(i)     For each six-month period beginning with the first day of the onset reporting date and for the duration of the Agreement, a report that specifies, as to the interpreter services provided during that period, the total numbers of hours and the total dollar amount billed to DMH.

2.     Within 30 days of posting to their website the notice described in ¶IV.7 above, the DSS defendants, by the DMH defendants or otherwise, shall serve upon plaintiffs' counsel a declaration attesting that they posted and/or placed (by a link or otherwise) in a Provider Bulletin the notice described in ¶IV.7 above, and providing a copy of the notice posted and/or placed.

## VI.     Release and Dismissal of Plaintiffs' Claims, Enforcement of the Agreement, and Duration of the Agreement

1.     In consideration of defendants' undertakings in the Agreement, plaintiffs agree, as described below, to:  (a) release all of their claims that were presented in the Lawsuit against defendants (and the State of Missouri, and any current or former employees of the DMH or DSS); (b) move voluntarily to dismiss all such claims, pursuant to Fed. R. Civ. P. 41(a)(2) (the "Rule 41(a)(2) motion").

2.     To effectuate the release and dismissal of plaintiffs' claims, as described below, plaintiffs, within ten days after the execution of this agreement, shall file with the court:

(a)     an amended motion, pursuant to Fed. R. Civ. P. 23(a) and (b)(2), seeking certification of a plaintiff class as defined in Ex. A hereto;

(b)     a motion, pursuant to Fed. R. Civ. P. 23(e), for tentative approval of the

28

Agreement as fair, reasonable and adequate;

(c)    a motion, pursuant to Fed. R. Civ. P. Rule 41 (a)(2), for voluntary dismissal of all of plaintiffs' claims in the Lawsuit, by entry of an order finally approving the Agreement (which Agreement is incorporated into such order) as fair, reasonable, and adequate under Fed. R. Civ. P. 23(e) and dismissing such claims.

3.    The effective date of the Agreement shall be the date the court finally approves it, if it does, pursuant to Fed. R. Civ. P. 23(e), following the fairness hearing that provision requires.

4.    Effective with the court's final approval of the Agreement, pursuant to Fed. R. Civ. P. 23(e), plaintiffs shall be deemed to have released all of their claims presented in the lawsuit against defendants (and the State of Missouri, and any current or former employees of the DMH or DSS) and all such claims shall be dismissed pursuant to Fed. R. Civ. P. 41(a)(2), by the entry of a order identical to or substantially similar to the one attached hereto as Exhibit B ("Exhibit B Order").

5.    Plaintiffs acknowledge that, if their claims are released and voluntarily dismissed, as sought in the motion they are required to file under ¶VI.2(c) above, then they shall not then be permitted to reopen any issue resolved by the Agreement, and shall be permitted to enforce the Agreement (which the court retains jurisdiction to enforce) only insofar as authorized by the court order dismissing such claims, by such court order, as does the Exhibit B Order, incorporating the terms of the Agreement into the Order. Plaintiffs also acknowledge that, if a court Order such as the Exhibit B order is entered, that they will thereafter be barred from filing suit against any defendant (and the State of Missouri, and any current or former employees of DMH or DSS) based on any class claims, causes of action, demands and rights presented in the

29

Lawsuit against defendants and arising prior to the execution of the Agreement.

6.     If plaintiffs are of the view that defendants are in breach of any provision of the Agreement at §§II-VI above, they shall give written notice of the alleged breach to defendants (by notice served upon their counsel), describing in the notice not only the breach, but the remedy sought for it. Within 30 days following notice of the breach, counsel for the parties, together with, if counsel wish, the parties themselves or their representatives, shall meet in person in an attempt to resolve differences between the parties respecting the alleged breach. (This initial meeting between counsel is referred to herein as the "first Agreement enforcement meeting"). If the first Agreement enforcement meeting is unsuccessful in resolving the differences between the parties, counsel may conduct such additional Agreement enforcement meetings in person or by telephone, as they believe may resolve their differences without the need for a court to decide an Enforcement Motion (*see* ¶VI.7 below) under the Agreement.

7.     If defendants' alleged breach of the Agreement is not resolved to plaintiffs' satisfaction within 90 days after they afford defendants written notice of the breach, then plaintiffs may file with court a motion seeking enforcement of the Agreement (the "Enforcement Motion").

8.     Notwithstanding ¶¶VI.6-7 above, plaintiffs may file a motion seeking enforcement of the Agreement without having first given defendants written notice of an alleged breach of the Agreement, and without a first Agreement enforcement meeting having been conducted, if they (plaintiffs), in the motion, allege a substantial breach of or threatened imminent and substantial breach of, the Agreement that, unless remedied promptly, will cause substantial and irreparable injury to the plaintiff class as a whole or substantial numbers of plaintiffs. Circumstances that

30

would warrant the filing of such a motion ("Emergency Enforcement Motion") would be sudden or imminent closure of facilities defendants have promised to maintain under the Agreement or the sudden or imminent cessation of the provision of an entire category of mental health services to the class of plaintiffs (or substantial numbers of them) specially, the sudden or imminent cessation of an entire category of mental health services to all persons eligible for DMH services is not a circumstance warranting the filing of an Emergency Enforcement Motion under this paragraph.

9. The denial or termination of mental health services to individual plaintiffs based on facts particular to their individual cases (*e.g.*, relating to their diagnosis and the efficacy of treatment provided them), or facts, if true, that would establish only isolated departures, in individual cases, from ongoing DMH policy and practices applicable to plaintiffs generally, shall not be deemed to constitute a breach of this Agreement or to constitute circumstances requiring the conduct of one or more Agreement enforcement meetings or making permissible the filing of an Enforcement Motion or Emergency Enforcement Motion. Further, nothing in the Agreement shall be construed to confer upon an individual plaintiff a remedy in his or her individual case. If an individual plaintiff believes that he or she is aggrieved by a decision of one or more of the defendants in his or her individual case, the individual plaintiff is relegated to the administrative and judicial remedies available to him or her, to redress such decisions.

10. The Agreement shall expire on July 1, 2016, all obligations under the Agreement terminating as of that date, unless plaintiffs, by a motion filed not less than 60 days prior to the July 1, 2016 termination date, shall show good cause why the Agreement should be extended, the Agreement, however, to continue in force until the court, by its resolution of said motion or

31

otherwise, decides that the Agreement should expire. It is the parties' expectation, however, that the court will decide any timely motion that plaintiffs file to extend the Agreement on or before the July 1, 2016 expiration date.

**VII.   Attorneys' Fees, Including Litigation Expenses, and Costs.**

1.   Defendants agree to pay plaintiffs, within 60 days of the execution of the Agreement, $91,167.60 in litigation expenses and costs incurred on or before December 31, 2011.

2.   The parties not having reached an agreement as to attorneys' fees, the fees to be awarded for plaintiffs' attorneys' work on the case, and also the costs and litigation expenses incurred by plaintiffs on or after January 1, 2012 to be awarded, shall be determined by the following process.

(a)   Within 21 days of the date the Agreement is executed, plaintiffs shall file with the court their motion for attorneys' fees ("Fee Motion"), together with their suggestions in support of the Fee Motion ("Opening Suggestions"), the Opening Suggestions not to exceed 15 pages. The Opening Suggestions shall include as an Exhibit a Statement ("Fee Statement") that denominates the total amount of the fees claimed by plaintiffs and a summary table giving the name, claimed hours, claimed hourly rates, and claimed total of fees sought for each biller (except that paralegals or law students employed by or affiliated with one of plaintiffs' attorneys for whose work fees are claimed need not be identified by name, but may be identified as a group). The Fee Statement shall not count against the 15 page limit. Together with the Fee Motion, plaintiffs shall also file with the court the time records on which the Fee Motion is based ("Time Records")—that is records itemizing the hours (by biller and date and summary

32

description of work) for which fees are sought. The close date of the Time Records ("close date") shall not be earlier than 21 days prior to the date the Fee Motion is filed. The Time Records may be redacted to prevent disclosure of material protected by the attorney client privilege and the work-product privilege and shall reflect such reasonable billing adjustments as plaintiffs see fit to make. Together with the Fee Motion, plaintiffs shall also file with the court a summary accounting ("Accounting") of such billing adjustments to the Time Records plaintiffs have made, the Accounting to denominate, by biller, the number of hours excluded in the exercise of plaintiffs' counsel's billing judgment, and the general bases for the exclusions. Together with the Fee Motion, plaintiffs may also file with the court such other evidentiary materials, such as declarations of practicing attorneys, as they deem appropriate.

(b)     Within 21 days after the filing of the Fee Motion, defendants shall be entitled to take the depositions of up to three of plaintiffs' attorneys, the scheduling of such depositions to be by agreement or if no agreement is possible, by written notice to plaintiffs' attorneys.

(c)     Defendants shall have 45 days from the service of the Fee Motion upon them to file with the court Responsive Suggestions in Opposition to the Fee Motion ("Responsive Suggestions"), the Responsive Suggestions not to exceed 15 pages. Defendants may also file with the court such evidentiary materials in support of their Responsive Suggestions as they deem appropriate, and any such evidentiary materials filed in support shall not count against the 15 page limit.

(d)     Plaintiffs shall have 21 days from the service of the Responsive Suggestions upon them to file Reply Suggestions in Support of the Fee Motion ("Reply Suggestions"), the Reply Suggestions not to exceed 10 pages. Together with the Reply Suggestions, plaintiffs shall file

33

with the court their time records covering the period since the close date ("Supplemental Time Records"), and a supplemental bill of costs and litigation expenses covering the period on or after January 1, 2012 only ("Supplemental Bill of Costs and Litigation Expenses"), provided, however, that the only costs and litigation expenses that may be claimed for this period are: printing/photcopying costs (capped at 5 cents a page for printing/copying costs born internally by plaintiffs' attorneys' offices); travel (including lodging) expenses; and postage and courier service expenses. Together with the Supplemental Time Records, plaintiffs shall file a Supplemental Fee Statement that denominates the total amount of the fees claimed by plaintiffs for their work on or after the close date and a summary table giving the name, claimed hours, claimed hourly rates, and claimed total of fees sought for each biller for their work after the close date (except that paralegals or law students employed by or affiliated with one of plaintiffs' attorneys for whose work fees are claimed need not be identified by name, but may be identified as a group). The filing of the Supplemental Time Records and the Supplemental Fee Statement shall constitute plaintiffs' claim for fees in connection with work undertaken after the close date ("Supplemental Claim for Fees").

(e)     If defendants object to either the Supplemental Bill of Costs and Litigation Expenses or the Supplemental Claim for Fees, they may file, within seven days of the filing of the Supplemental Bill of Costs and Litigation Expenses and the Supplemental Claim for Fees, their suggestions in opposition to one or both filings, such suggestions in opposition not to exceed five pages. No reply to such suggestions in opposition may be filed by plaintiffs without prior leave of court, for good cause shown.

(f)     The court may schedule an oral argument or conduct an evidentiary hearing

34

respecting the Fee Motion if it deems either one or both appropriate.

(g)     The court may on motion on or in its own initiative modify any of the above provisions provided for in this ¶VII.2, including extending the deadlines for filings, and may issue instructions or orders resolving disputes between plaintiffs and defendants respecting the process set forth above or for any other purpose respecting this process it deems appropriate. Plaintiffs and defendants may also agree to extend the deadlines for any filings for up to 14 days, and shall notify the court as to any such agreements promptly after they are reached.

(h)     The Agreement shall not constitute an admission by the defendants that the plaintiffs are prevailing parties on all issues raised in this matter, but only an agreement to pay plaintiffs the amount of fees as finally determined by the court (after any appeals by defendants have been exhausted).

## VIII.  Execution of Agreement

1.     The Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter contained herein. The parties hereby declare and represent that no promise, inducement or agreement not herein expressed has been made.

2.     The undersigned counsel represent that they are authorized by their clients, plaintiffs and defendants here, to enter into the Agreement.

3.     This Agreement shall be governed by and construed in accordance with the laws of the United States and of the State of Missouri.

35

AGREED:

Plaintiffs by:

_Robert E Lehrer_      Dated: _2/10/12_
One of Plaintiffs' Attorneys

Defendants by:

_Joanna Lu Trachtenberg by JJAChack_      Dated: _2/10/12_
Attorney for the DMH Defendants

_John E Chack_      Dated: _2/10/12_
Attorney for the DSS Defendants

Kenneth M. Chackes
Chackes, Carlson & Halquist, LLP
230 S. Bemiston Ave. Suite 800
St. Louis, MO 63105
Phone: 314-872-8420
Fax: 314-872-7017
kchackes@cch-law.com

Robert E. Lehrer
Law Offices, Robert E. Lehrer
36 S. Wabash Ave. Suite 1310
Chicago, IL 60603
Phone: 312-332-2121
Fax: 312-422-0708
rlehrer@rlehrerlaw.com

John J. Amman
Legal Clinic
Saint Louis University School of Law
321 N. Spring Street
St. Louis, MO 63108
Phone: 314- 977-2796
Fax: 314-977-1180
ammannjj@slu.edu

Susan K. Eckles
Managing Attorney
Missouri Protection and Advocacy Services
1992 Innerbelt Business Center Drive
Overland, MO 63114
Phone: 314-785-1707
susan.eckles@mo-pa.org
Attorneys for Plaintiffs

36

Joanna L. W. Trachtenberg
Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-9456
Joanna.Trachtenberg@ago.mo.gov
Attorney for the DMH defendants

Sara E. Dick
Assistant Attorney General
P. O. Box 899
Jefferson City, MO 65102
Phone: 573-751-3321
Fax: 573-751-9456
Sara.Dick@ago.mo.gov
Attorney for the DSS Defendants

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI, CENTRAL DIVISION

| | |
|---|---|
| Christine Comas et al,       ) | |
|       ) | |
| Plaintiffs,       ) | |
|       ) | |
| v.       ) | No. 2-10-cv-04085-MJW |
|       ) | |
| Keith Schafer, Director, etc.       ) | |
|       ) | |
| Defendants.       ) | |

## ORDER

On _____, 2012, plaintiffs presented an amended motion for certification of a plaintiff class (Doc. ), pursuant to Fed. R. Civ. P. (a), (b)(2) and (c)(1). For settlement purposes only, defendants have agreed to the certification of a plaintiff class as defined below in ¶2 below, though not to the supporting findings set forth in ¶1 below. For settlement purposes only, defendants also agree that the following attorneys should be appointed as class counsel for the plaintiff class, pursuant to Fed. R. Civ. P. 23(g): Kenneth M. Chackes, Robert E. Lehrer, and John J. Ammann

Based on plaintiffs' amended motion and the authorities cited or referenced there, and also on defendants' agreement as described above, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

1.      The plaintiff class as defined in ¶2 below is so numerous (exceeding 1200 persons) that joinder of all members is impractical, there are questions of law or fact common to the class, the claims of the representative parties ((Christine Comas; Michael Randy Gilmartin, by his guardian ad litem DeLinda Belanger; Jaymi Smith; Kim Smith, by her mother and guardian Betty Jo Ann Nelson; B. C., by her mother and next friend Joanna Campbell; M. K., by her mother and next friend Julie Kocher; Alex Cerame; by his mother and next friend Sheri Cerame; Sean Cheek; Ann Forbes and Gregory Forbes, husband and wife; Chrystal Bumphrey, by her mother and legal guardian Jennifer Bumphrey; Greg Mosley; Darren Politte) are typical of the claims of the plaintiff class, and  the representative parties will fairly and adequately protect the interests of the class. Further, defendants have acted or refused to act on grounds that apply generally to the class, making the relief afforded by the Agreement appropriate respecting the class a whole. Finally, based on the declarations submitted to the court in support of plaintiffs' initial motion for class certification (Doc. 16 by three of plaintiffs' counsel (Kenneth M. Chackes, Robert E. Lehrer, and John J. Ammann), which declarations attest to these attorneys' extensive experience in the litigation of civil rights cases, including class actions, these three attorneys are qualified to act as class counsel.

i

EXHIBIT A

2.     Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and (c), a plaintiff class is certified in this case, defined as follows:

> All persons residing in Missouri on or after April 26, 2005 who: (a) have been, are, or will be deaf, that is, are persons who because of a hearing loss, are not able to discriminate speech when spoken in a normal conversational tone regardless of the use of amplification devices; and (b) have been, are, or will be eligible for services, from or through the Missouri Department of Mental Health and/or the Missouri Department of Social Services (including from administrative agents of DMH), that diagnose mental illness and/or treat it.

3.     Pursuant to Fed. R. Civ. P. 23(g), the following attorneys are appointed as class counsel for the plaintiff class:  Kenneth M. Chackes; Robert E. Lehrer; John J. Ammann.

ENTER:


Dated:_____

_____
United States Magistrate Judge


Agreed as to Form and Content:

Plaintiffs by:

_____        Dated:  2/10/12
One of Plaintiffs' Attorneys



Defendants by:


_____ by        Dated:  2/10/12
Attorney for the DMH Defendants

_____        Dated:  2/10/12
Attorney for the DSS Defendants


ii

Kenneth M. Chackes
Chackes, Carlson & Halquist, LLP
230 S. Bemiston Ave. Suite 800
St. Louis, MO 63105
Phone: 314-872-8420
Fax: 314-872-7017
kchackes@cch-law.com

Robert E. Lehrer
Law Offices, Robert E. Lehrer
36 S. Wabash Ave. Suite 1310
Chicago, IL 60603
Phone: 312-332-2121
Fax: 312-422-0708
rlehrer@rlehrerlaw.com

John J. Amman
Legal Clinic
Saint Louis University School of Law
321 N. Spring Street
St. Louis, MO 63108
Phone: 314- 977-2796
Fax: 314-977-1180
ammannjj@slu.edu

Susan K. Eckles
Managing Attorney
Missouri Protection and Advocacy Services
1992 Innerbelt Business Center Drive
Overland, MO 63114
Phone: 314-785-1707
susan.eckles@mo-pa.org
Attorneys for Plaintiffs

Joanna L. W. Trachtenberg
Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-9456
Joanna.Trachtenberg@ago.mo.gov
Attorney for the DMH defendants

Sara E. Dick
Assistant Attorney General
P. O. Box 899
Jefferson City, MO 65102
Phone: 573-751-3321
Fax: 573-751-9456
Sara.Dick@ago.mo.gov
Attorney for the DSS Defendants

iii

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI, CENTRAL DIVISION

| | |
|---|---|
| Christine Comas et al, )  |  |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 2-10-cv-04085-MJW |
| ) | |
| Keith Schafer, Director, etc. ) | |
| ) | |
| Defendants. ) | |

## ORDER

This Order is entered following the conduct of the fairness hearing provided for under Fed. R. Civ. P. 23(e) and notice to the plaintiff class also provided for under that provision, and pursuant to the parties' Settlement Agreement ("Agreement"), executed on _____, 2012; Fed. R. Civ. P. 23(e); Fed. R. Civ P. 41(a)(2); plaintiffs' motion to dismiss their claims pursuant to Fed. R. Civ. P. 41(a)(2).

It is hereby ORDERED, ADJUDGED, AND DECREED as follows:

1.    The court has jurisdiction over this case pursuant to 28 U.S.C. §§1331, 1343(3)(4), and venue is proper in the Western District of Missouri pursuant to 28 U.S.C. §1391.

2.    The settlement of all of plaintiffs' claims and their voluntary dismissal, pursuant to the Agreement, is approved as fair, reasonable and adequate, pursuant to Fed. R. Civ P. 23(e)(2).

3.    Plaintiffs' motion to dismiss all their claims against defendants, pursuant to Fed. R. Civ. P. 41(a)(2) is granted and all such claims are dismissed pursuant to that provision, such dismissal barring plaintiffs from reopening any issue resolved by the Agreement, which the court hereby retains jurisdiction to enforce, and plaintiffs being permitted to enforce the Agreement only insofar as specifically authorized by the Agreement, which is incorporated into this Order.

ENTER:

Dated: _____

_____
United States Magistrate Judge

i                                                    **EXHIBIT B**